**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **MacroPoint, LLC,** | ) |
| Plaintiff, | ) CASE NO.: 1:15CV1002 |
| | ) |
| vs. | ) JUDGE PATRICIA A. GAUGHAN |
| | ) |
| **FourKites, Inc.,** | ) |
| Defendant. | ) |

**PLAINTIFF MACROPOINT, LLC'S OPPOSITION TO**
**DEFENDANT FOURKITES, INC.'S MOTION TO DISMISS**
**<u>FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

I.          INTRODUCTION ............................................................................. 1

II.        BACKGROUND ............................................................................. 3

      A.      MacroPoint .............................................................................. 3

      B.      The Patent-in-Suit .................................................................. 4

      C.      Conventional Tracking Methods are Limited ........................... 4

      D.      The Patents-in-Suit Are Novel ............................................... 6

III.      LEGAL ARGUMENT .................................................................... 7

      A.      Standard Of Review ................................................................ 7

                1.      Patents are Presumed Valid ........................................ 8

                2.      Clear And Convincing Evidence Standard Applies .................... 9

                3.      The Burden is Especially Heavy Because The Patent Examiner Already Considered FourKites' Asserted Basis For Invalidity ........................................ 9

      B.      Defendant Failed To Satisfy Its Burden ................................. 10

                1.      The patents-in-suit already passed *Alice's* two-part test ............................................................................. 10

                2.      FourKites' Assertion Is Not Supported By The Case Law ............................................................................. 11

                     a.      FourKites' reliance on *Ultramercial* is misplaced ................................................... 11

                     b.      FourKites' reliance on *Wireless Media Innovations* is misplaced ................................. 12

                     c.      The cases cited by FourKites are inapposite ................................................... 14

      C.      Standard For Patent-Eligible Subject Matter – The Two-Part Test ................................................................................ 15

1.  FourKites Fails to Demonstrate that the Claims Preempt the Field of Tracking Freight with a Computer ................................................................ 16

2.  The Claims of the Patents-in-Suit are Directed to more than an Abstract Idea .......................................... 18

3.  The Claims of the Patents-in-Suit Pass the Second Part of the *Alice* Test ................................................ 23

   a.  A First Inventive Concept – Correlation of Location Information of a Communications Device to Location of the Freight or a Vehicle ................................... 24

   b.  A Second Inventive Concept – Obtaining Location Information of Communications Device from a "Location Information Provider" – a Party or Device Other than the Communications Device. ........................... 26

   c.  Third Inventive Concept – Providing Notice and/or Consent to the User that Location Information of the Communications Device is being Obtained ................. 27

IV.  CONCLUSION .................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ............................................................................ *passim*

*Ameritox, Ltd. v. Millennium Health, LLC*,
    No. 13-cv-832-wmc, 2015 U.S. Dist. LEXIS 53818 (W.D. Wis. Apr. 24,
    2015) ....................................................................................................................9

*Bilski v. Kappos*,
    561 U.S. 593 (2010) .........................................................................................15, 21

*CLS Bank Int'l v. Alice Corp. Pty*,
    717 F.3d 1269 (Fed. Cir. 2013) ...............................................................................21

*Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*,
    No. 12-4878, 2014 U.S. Dist. LEXIS 115543 (D.N.J. Aug. 19, 2014) ....................................9

*DDR Holdings, LLC v. Hotels.com. L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) ..............................................................22, 23, 29

*Ennenga v. Starns*,
    677 F.3d 766 (7th Cir. 2012) ...............................................................................10

*Impax Labs, Inc. v. Aventis Pharms. Inc.*,
    545 F.3d 1312 (Fed. Cir. 2008) ..............................................................................9

*Lawrence v. Chancery Court of Tenn.*,
    188 F.3d 687 (6th Cir. 1999) .................................................................................7

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
    132 S. Ct. 1289 (2012) .........................................................................15, 16, 21, 22

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.*,
    2015 U.S. Dist. LEXIS 49408 (D. Del. Apr. 15, 2015) ..........................................22, 23

*Progressive Cas. Ins. Co. v. Safeco Ins. Co.*,
    No. 1:10 CV 1370, 2010 U.S. Dist. LEXIS 120225 (N.D. Ohio Nov. 12, 2010)
    (J. Gaughan) ..................................................................................................8, 9, 13

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ............................................................................ *passim*

*Vita-Mix Corp. v. Basic Holdings, Inc.*,
    No. 1:06 CV 2622, 2007 U.S. Dist. LEXIS 71947 (N.D. Ohio Sept. 27, 2007)
    (J. Gaughan) ........................................................................................................7, 11

*Wireless Media Innovations, LLC v. Maher Terminals, LLC*,
    Nos. 14-7004; 14-7006, 2015 U.S. Dist. LEXIS 51811 (D.N.J. Apr. 20, 2015) ...........3, 12, 13

**Statutes**

35 U.S.C. § 101 ................................................................................................ *passim*

35 U.S.C. §§ 102, 103, and 112 .............................................................................2

35 U.S.C. § 282 ...................................................................................................8

**Other Authorities**

76 FR 74618 .....................................................................................................10

Fed. R. Civ. P. Rule 12(b)(6) ..............................................................................7

## I.     INTRODUCTION

FourKites contends that the patents-in-suit are invalid because they claim an "abstract idea" and that FourKites should be free to appropriate MacroPoint's invention.  FourKites is wrong.  Contrary to FourKites' contention, the claims of the patents-in-suit are precisely the type of claims that are patent-eligible subject matter under 35 U.S.C. § 101 as set forth in the Supreme Court's *Alice* decision.  Reduced to its logical conclusion, FourKites' argument leaves no doubt that it would like this Court to simply conclude that *Alice* holds that all patent claims with any connection to software are "abstract ideas" and are not patent-eligible subject matter.  FourKites contents that it need only to articulate an abstract idea that purports to encompass the subject matter of the patents-in-suit in their broadest sense, strip the claims of all limitations, replace those limitations with a generic summary, and conclude that the patents-in-suit are therefore "abstract."   This is no different than characterizing Edison's light bulb as "a means for illumination" or the Wright Brothers' plane as "a means for travel" and thereby render these inventions as no more than "abstract" ideas.  To this end, FourKites uses *Alice* and its progeny as a shibboleth, not as a basis for sound argument.

The Supreme Court established a two-part test for determining if claims are patent-eligible subject matter under 35 U.S.C. § 101.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).  Unfortunately for FourKites, this two-part test requires actual analysis of the claim limitations of the patents-in-suit and not counsel's truncated summary of the claims. FourKites' arguments are thoroughly deficient.  FourKites' arguments lack the required analysis of all claims and all limitations of those claims.  FourKites' arguments consider only a handful of words in the claims before concluding that ninety-four claims across five patents-in-suit are not patent-eligible subject matter.  FourKites fails to satisfy its burden in proving that the patents-in-suit are invalid under 35 U.S.C. § 101 as a matter of law.

1

As discussed below, when the claim limitations are properly analyzed under the two-part *Alice* test, it is clear that the claims of the patents-in-suit are patent-eligible subject matter.  In fact, the United States Patent and Trademark Office ("PTO") ***already*** determined that claims of the patents-in-suit not only are directed to patent-eligible subject matter under 35 U.S.C. § 101 as set forth in *Alice*, but patentable under all legal requirements, including 35 U.S.C. §§ 102, 103, and 112.

FourKites' most glaring omission is its lack of any acknowledgement whatsoever that four of the five patents-in-suit were examined and granted by the PTO ***after*** both the *Alice* decision and the PTO's issuance of specific guidelines regarding the examination of claims in light of the *Alice* two-part test.[1]  Tellingly, FourKites ignores this critical fact.  FourKites asks this Court to invalidate patents examined and granted by the PTO, with full knowledge and understanding of *Alice* and its two-part test, based only on FourKites' superficial analysis of the claims.  The PTO's post-*Alice* examination, grant, and issuance provide the claims of the patents-in-suit with a presumption of validity.  A presumption that FourKites' analysis and arguments fail to overcome.

Additionally, FourKites' arguments lack any discussion as to the applicable evidentiary standard.  Where a party challenges the validity of a patent, the challenging party's burden is to show the patent is invalid by clear and convincing evidence.  Again, it is telling that FourKites omitted any discussion of evidentiary standard because FourKites' Motion to Dismiss falls well short of satisfying this burden.

Finally, FourKites' relies heavily on two distinguishable and inapplicable cases –

---

[1] The *Alice* decision issued on June 19, 2014. The PTO issued its first set of examination guidelines in light of *Alice* on June 25, 2014, and its second set of examination guidelines on December 16, 2014.  (*See* Exs. 1 and 2, respectively)  The '295, '097, '098, and '313 patents were examined from February to April of 2015 and issued in June or July of 2015.

2

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720 (Fed. Cir. 2014) and *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, Nos. 14-7004; 14-7006, 2015 U.S. Dist. LEXIS 51811 (D.N.J. Apr. 20, 2015) – and a listing of twenty-five cases without analysis or argument as to why even one of these twenty-five cases is applicable or even relevant to the patents-in-suit. Unsurprisingly, each of these twenty-five cases involves patents granted before the *Alice* decision, and thus, examined by the PTO without any knowledge of *Alice* or the benefit of the PTO's *Alice* guidelines.

Simply put, FourKites has failed to meet its burden in seeking to have the First Amended Complaint dismissed.  Thus, FourKites' Motion to Dismissed should be denied.

## II.    BACKGROUND

### A.    MacroPoint

Plaintiff MacroPoint, based in Cleveland, Ohio, develops and licenses monitoring and tracking solutions for shippers, brokers and third party logistics providers.  Since its founding, MacroPoint has invested significant time, energy and resources to researching, developing, and implementing innovative technologies that provide novel solutions for the freight tracking industry.  As part of this investment of resources, MacroPoint has allocated much labor and capital to diligently pursuing patent rights to protect its innovative technology.  MacroPoint is the owner of seven U.S. patents, including the five patents-in-suit.

MacroPoint's innovative technologies facilitate automated monitoring and tracking services and provides third parties with visibility to the location of vehicles and freight. MacroPoint's technology can be used with cell phones, including both "smartphones" and older "flip phones," and electronic logging devices ("ELD") that can be secured to a vehicle. MacroPoint's solutions provide real-time location monitoring and tracking, delivery monitoring, and event notifications to third parties.  To date, MacroPoint's solutions enable the tracking of

approximately 300,000 drivers and vehicles, which support thousands of brokers, shippers and trucking companies.

B.    The Patent-in-Suit

The patents-in-suit are U.S. Patent Nos. 8,604,943 (the "'943 patent"); 9,070,295 (the "'295 patent"); 9,082,097 (the "'097 patent"); 9,082,098 (the "'098 patent"); and 9,087,313 (the "'313 patent") (collectively, "patents-in-suit").  (*See*, First Amended Complaint, D.I. 16, Exs. A-E.)  The '943 patent issued on December 10, 2013, and the remaining four patents-in-suit issued between June 30, 2015, and July 21, 2015, more than a year **after** the Supreme Court's *Alice* decision.[2]  The patents-in-suit are directed to systems and methods for obtaining or monitoring the location of a vehicle and freight carried by a vehicle utilizing a communications device correlated to the vehicle or freight, where the location of the communications device is received from a party or device other than the communications device itself (*i.e.*, a third party) and the user of the communications device provides consent for obtaining and transmitting location information about the communications device.  (*See* '943 patent at 2:14-36.)[3]  Systems and methods of the patents-in-suit solve specific problems of tracking vehicles and freight by providing an unconventional technological environment.  (*See* Zatkovich Decl. at ¶¶ 90-91.)[4]

C.    Conventional Tracking Methods are Limited

At the time of the invention of the patents-in-suit, conventional methods and systems for tracking vehicles and freight suffered from a number of shortcomings and challenges when compared to the methods and systems of the patents-in-suit, and the patents-in-suit address and

---

[2] The '295 patent issued on June 30, 2015; the '097 and '098 patents issued on July 14, 2015; and the '313 patent issued on July 21, 2015.
[3] All the patents-in-suit share a common written description and drawings.  References to the written description of drawings of the patents-in-suit will generally be made to the '943 patent.
[4] Plaintiff MacroPoint submits as Ex. 3, the Declaration of Ivan Zatkovich in Support of MacroPoint's Opposition to FourKites Motion to Dismiss.  Mr. Zatkovich is a technical expert with over thirty years of experience in in computer science and computer network architecture, including experience in tracking freight.  (*See id.*at ¶¶ 4-15.)

resolve those challenges.  For example, the architecture of conventional systems results in a "closed system."  (Zatkovich Decl. at ¶¶ 48-63.)  In a closed system, transmission of vehicle and freight location information is limited to a closed user group.  For example, location information may be transmitted only between vehicles in a freight company's fleet and the freight company's dispatch center or monitoring service.  (*Id*.)  Closed systems are typically proprietary to a freight company.  (*Id*.)  The freight company's clients, such as shippers that contract with the freight company to ship freight, need to rely on the freight company to relay the client's freight's location information.  (*Id*.)  The freight company can provide its clients with subscription based monitoring services; however, such services can be prohibitively expensive for clients that monitor small numbers of vehicles of loads.  ('943 patent at 1:37-44; Zatkovich Decl. at ¶ 57.)  Users of closed systems must be familiar with and interoperate with multiple closed systems if they wish to use more than one carrier system, as is typical in the freight industry.  (Zatkovich Decl. at ¶¶ 48-63.)

Another limitation of conventional systems is standardization of methods and equipment used to track location of a vehicle or freight.  For example, conventional systems typically install the same tracking equipment in all vehicles to be tracked and use a common method for tracking all vehicles.  (Zatkovich Decl. at ¶ 59.)  Such standardization provides for a rigid system that can track only vehicles or freight equipped with the right type of equipment.  Additionally, conventional systems "discretely" monitor the location of a vehicle or freight by monitoring only the last known position, *i.e.*, a distribution center, location of a pickup or delivery, or other discrete check points.  (*Id*. at ¶¶ 60-62.)  Such monitoring does not provide for "real-time" monitoring of vehicles or freight.

D.    The Patents-in-Suit Are Novel

The patents-in-suit are directed to novel and specific ways of tracking vehicles and freight. The patents-in-suit claim the tracking of a vehicle or freight in part by determining the location of a communications device that is correlated to the vehicle or freight. The location of the communications device is received from a "location information provider." The location information provider is a party or device other than the communications device itself, *i.e.*, a third party or device controlled by a third party. ('943 patent at 4:33-50.) The location information provider can be:

- a wireless service provider providing wireless service to the communications device,

- a third party that obtains the location information of the communications device from the wireless service provider providing wireless service to the communications device, or

- a party that has access to the location information of the communications device but is other than the wireless service provider or the third party that obtains the location information of the communications device from the wireless service provider.

(*Id.* at 21:19-29.) The use of a location information provider results in an "open system," where the location of a vehicle or freight can be shared outside the group. Unlike conventional systems, location information is not directly received from the vehicle, and the location information is not directly sent from the vehicle to the freight company. In the claimed systems and methods of the patents-in-suit, requests for location information are sent to the location information provider, and those requests are for location of a communications device. ('943 patent at 2:14-35; Zatkovich Decl. at ¶¶ 70-71.) The claimed systems and methods use location information of communications devices to then determine the location of vehicles and freight.

The advantages of an open system include: support for multiple parties, including the freight company and its clients, to request vehicle and freight location information; support for communications devices that span multiple technologies; enhancing the ability of shippers and

brokers to use multiple carrier system; and real-time tracking location of vehicles or freight because third parties such as wireless services have the technology to monitor communications devices continuously in real-time. (Zatkovich Decl. at ¶¶ 70-75.)

The use of a location information provider to facilitate an open system creates technical challenges that need to be solved to implement such systems.  A new network architecture is required to integrate one or more third party location information providers, facilitate the use of multiple types of communications devices, and handle location requests for vehicles and freight from multiple parties.  (*Id.*)  Additionally, open systems have privacy concerns that are addressed by the claimed systems and methods of the patents-in-suit.  (*Id.* at ¶¶ 84-89.)  The patents-in-suit solve these challenges, and provide innovative improvements over conventional systems. (*Id.*)

Each of these specific technological innovations make the patents-in-suit necessarily more than an "abstract" idea.  The patents-in-suit rest on specific, tangible and valuable improvements that provide precisely the sort of inventive concept that constitutes patentable subject matter under 35 U.S.C. § 101.

**III.**    **LEGAL ARGUMENT**

A.    Standard Of Review

When considering a motion to dismiss made under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true and construe the complaint liberally in favor of the plaintiff.  *Vita-Mix Corp. v. Basic Holdings, Inc.*, No. 1:06 CV 2622, 2007 U.S. Dist. LEXIS 71947, at *4-5 (N.D. Ohio Sept. 27, 2007) (J. Gaughan) (citing *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999)). Further, when an allegation is capable of more than one inference, it must be construed in the plaintiff's favor.  *Id.*

1.     Patents are Presumed Valid

"By statute, a patent is presumed to be valid, and each claim of a patent is presumed to be valid independently of the validity of the other claims." *Progressive Cas. Ins. Co. v. Safeco Ins. Co.*, No. 1:10 CV 1370, 2010 U.S. Dist. LEXIS 120225, *7-8 (N.D. Ohio Nov. 12, 2010) (J. Gaughan) (citing 35 U.S.C. § 282).  This presumption should apply to FourKites' Motion.

It has been suggested that such a presumption of validity should not apply when assessing whether claims meet the demands of § 101 because, as stated by Circuit Judge Mayer in a concurring opinion, the PTO "has for many years applied an insufficiently rigorous subject matter eligibility standard …."  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720 (Fed. Cir. 2014).  The circumstances that concerned Circuit Judge Mayer, however, do not apply here.  In the wake of the Supreme Court's *Alice* decision, the PTO twice issued specific guidelines to its examiners, which specifically instructed those examiners on how to determine patentability under § 101 in light of *Alice*.  Here, four of the five patents-in-suit were examined and issued **after** the *Alice* decision, **after** the PTO issued specific guidelines regarding the *Alice* decision, and **after** the PTO formally trained its examiners in applying those guidelines.  (*See* Kunin Decl. at ¶13.)[5]  Thus, the PTO's informed examination of four of the five patents-in-suit found the claims of the patents to be patent-eligible subject matter under the standard set forth in *Alice*. (*See id*.)  The four patents-in-suit examined and issued by the PTO post-*Alice* ('295 patent, '097 patent, '098 patent, and '313 patent) are all continuations of the '943 patent and subject to terminal disclaimers in light of the '943 patent.[6]  If the claims of the four patents-in-suit

---

[5] Plaintiff MacroPoint submits as Ex. 4, the Declaration of Steven G. Kunin in Support of MacroPoint's Opposition to FourKites Motion to Dismiss.  Mr. Kunin is an expert in PTO practices and procedures.  Mr. Kunin has over thirty years of experience with the PTO, including ten years as Deputy Commissioner for Patent Examination Policy.  *See id.*at ¶¶ 4-7.

[6] During the examination of the '295, '097, '098, and '313 patents, the PTO issued "nonstatutory double patenting" rejections citing the claims of the related '943 patent. (*See* Ex. 5, excerpts from prosecution history of patents-in-suit.)  Essentially, such a rejection is a statement by the PTO examiner that the claims of the related '943 patent

examined post-*Alice* passed muster as subject matter eligible, then the claims in the '943 patent would do so as well.  (Kunin Decl. at ¶14.)  Thus, all of the patents-in-suit should be afforded the presumption of validity when evaluating FourKites' Motion to Dismiss.

### 2.    Clear And Convincing Evidence Standard Applies

A party challenging patent validity has the burden to show by clear and convincing evidence that the patent is invalid.  *Progressive Cas. Ins. Co.*, 2010 U.S. Dist. LEXIS 120225 at *8 (citing *Impax Labs, Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008)).  *See also*, *Ameritox, Ltd. v. Millennium Health, LLC*, No. 13-cv-832-wmc, 2015 U.S. Dist. LEXIS 53818, at *3 (W.D. Wis. Apr. 24, 2015) (finding defendant failed to demonstrate through clear and convincing evidence that the patent is invalid under § 101); *Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*, No. 12-4878, 2014 U.S. Dist. LEXIS 115543, at *40 (D. N.J. Aug. 19, 2014) (observing that for the court to hold that the patent fails the *Alice* test, there must be clear and convincing evidence that every claim is invalidly abstract and contains only generic computer applications under any plausible construction of all claims).  In its challenge to the validity of the patents-in-suit under 35 U.S.C. § 101, FourKites must satisfy the burden of showing by clear and convincing evidence that each claim of the patents-in-suit is invalid.

### 3.    The Burden is Especially Heavy Because The Patent Examiner Already Considered FourKites' Asserted Basis For Invalidity

When faced with a similar § 101 challenge under Rule 12(b)(6), this Court noted that the patent challenger's burden is especially heavy when the patent examiner considered the asserted basis for invalidity during patent prosecution.  *Progressive Cas. Ins. Co.*, 2010 U.S. Dist. LEXIS 120225 at *15-16 (citing *Impax Labs*, 545 F.3d at 1314).  Here, FourKites challenges the validity

---

either anticipate or render obvious the claims of the pending application.  (*See, id.*)  The applicant overcame these rejections by the filing of a terminal disclaimer, which effectively makes the terms of the issued patent and pending application coterminous.  (*See, id.*)

of the patents-in-suit under 35 U.S.C. § 101 post-*Alice*. Specifically, FourKites asserts that the patents-in-suit are directed to patent-ineligible subject matter (*i.e.* abstract ideas). FourKites faces a heavy burden to show invalidity as a matter of law because, as discussed below, the PTO's patent examiner previously considered FourKites' asserted basis for invalidity and granted the subject matter of the patents-in-suit. (Kunin Decl. at ¶13.)

> B.   Defendant Failed To Satisfy Its Burden

>> 1.   The patents-in-suit already passed *Alice's* two-part test

On June 19, 2014, the Supreme Court issued its opinion in *Alice*. *Alice Corp.*, 134 S. Ct. at 2347. Less than a week later, on June 25, 2014, the PTO issued a Memorandum regarding the "Preliminary Examination Instructions in view of the Supreme Court Decision in *Alice Corporation Pty. Ltd. v. CLS Bank International, et al.*" (*See* Ex. 1.) These instructions specifically related to "subject matter eligibility claims involving abstract ideas, particularly involving computer-implemented abstract ideas, under 35 U.S.C. § 101." (*Id.* at p. 1.) The Memorandum provides that "further guidance will be issued" after additional consideration of the *Alice* decision and public feedback. (*Id.*) On December 16, 2014, the PTO issued the "2014 Interim Guidance on Patent Subject Matter Eligibility" *See* 76 FR 74618. (*See* Ex. 2.) The Court may take judicial notice of these dates and public documents. *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) (noting that a court may take judicial notice of dates readily ascertainable from public records when deciding a Rule 12(b)(6) motion).

Four of the five patents-in-suit were duly examined and granted by the PTO after the issuance of the PTO's 2014 Interim Guidance on Patent Subject Matter Eligibility and subsequently issued between June 30, 2015 and July 21, 2015. (*See*, First Amended Complaint, D.I. 16 at Exs. B-E.) It is indisputable that four of the patents-in-suit issued more than a year after the *Alice* decision and more than six months after the PTO issued its 2014 Interim Guidance

on Patent Subject Matter Eligibility.  It is at least a reasonable presumption—if not a fact—that these four patents were examined in accordance with the PTO's post-*Alice* guidelines, which applies the two-part test to determine patentable subject matter under 35 U.S.C. § 101.  At this stage of the pleadings such a presumption should be construed in MacroPoint's favor.  *Vita-Mix Corp.*, 2007 U.S. Dist. LEXIS 71947, at *4-5.  Nothing in the evidentiary record supports FourKites' patent invalidity assertions—in fact the record supports the exact opposite.

Tellingly, FourKites completely ignores the evidentiary record and the fact that the PTO already evaluated the subject matter of the patents-in-suit under the two-part *Alice* test and found the subject matter to be patent-eligible.  FourKites asks this Court to invalidate ninety-four claims across five patents based on its "analysis" of two claims in a single patent, and without any evidence supporting such a request.  FourKites' Motion consists of nothing more than attorney argument and a listing of distinguishable cases that are inapposite here.  Thus, FourKites' Motion to Dismiss should be denied.

2.     <u>FourKites' Assertion Is Not Supported By The Case Law</u>

a.     <u>FourKites' reliance on *Ultramercial* is misplaced</u>

FourKites relies heavily on *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed, Cir. 2014) to support its Motion to Dismiss.  *Ultramercial, Inc.* is distinguishable from the patents-in-suit, and FourKites' reliance on this case is misplaced.  *First*, the patent at issue in *Ultramercial, Inc.* was examined and issued prior to the *Alice* decision and the issuance of the PTO's corresponding examination guidelines, while the patents-in-suit here were examined, granted, and issued **post-*Alice***.  This is a significant distinction and fatal to FourKites' Motion to Dismiss.  *Second*, unlike the claim in *Ultramercial* the challenged claims here contain an inventive concept.  (Zatkovich Decl. at ¶¶ 132-37.)

*Alice* and *Ultramercial* do not create a bright line rule that all software claims are abstract

11

ideas and, therefore, ineligible subject matter.  In fact, the Federal Circuit acknowledged that it does not conclude that all software-based claims will constitute abstract ideas, and that future cases may turn out differently.  *Ultramercial, Inc.* 772 F.3d at 715.

Tellingly, FourKites makes no effort to perform the two-part *Alice* test referenced in *Ultramercial*.  FourKites' reliance on *Ultramercial* consists solely on asserting that the claims at issue here and in *Ultramercial* share three words (sending, receiving, and correlating).  (Mot. To Dismiss, D.I. 18, at p. 15.)  As a result, FourKites has asked this Court to ignore the PTO's examination process and the claims themselves, and invalidate five patents based on nothing more than three words.  FourKites' reliance on *Ultramercial* does not satisfy its heavy burden.

  b.  FourKites' reliance on *Wireless Media Innovations* is misplaced

FourKites also relies on *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, Nos. 14-7004; 14-7006, 2015 U.S. Dist. LEXIS 51811 (D.N.J. Apr. 20, 2015).  (Mot. To Dismiss, D.I. 18, at pp. 15-16.)  FourKites' reliance on *Wireless Media Innovations* also is misplaced.  The patents at issue in *Wireless Media Innovations* were examined and issued pre-*Alice*, a conclusive distinction.  FourKites asserts—without any factual or legal support—that the claims in *Wireless Media Innovations* are like the claims of the patent-in-suit.  FourKites is wrong.  The claims of the patents challenged in *Wireless Media Innovations* have nothing in common with the claims at issue here.  (*See* Exs. 6 and 7, U.S. Pat. Nos. 5,712,789 and 6,148,291, respectively.)

The claims in *Wireless Media Innovations* are directed to tracking shipping containers in a local, closed, single-channel, discrete environment.  (Zatkovich Decl. at ¶¶ 138-41.)  For example, independent claim 21 of Pat. No. 6,148,291 recites only:

  21. A method for using a computer to monitor usage of one or more docks associated
  with a facility, wherein the usage involves the presence or absence of a container at a
  dock, the method of comprising the steps of:

12

      (a) recording the presence of an identified container at a particular identified dock,

      (b) recording the absence of an identified container at a particular identified dock,

      (c) producing a report which identifies monitored docks and identifies containers present at identified docks, and also identifies docks at which a container is absent.

Any comparison between the claims at issue in *Wireless Media Innovation* and the claims of the patents-in-suit[7] concludes that no legitimate equivalency can be found.

The claims of the patents-in-suit are directed to systems and methods for obtaining or monitoring the location of a vehicle or freight utilizing a communications device correlated to the vehicle or freight, where the location of the communications device is received from a party or device other than the communications device itself (*i.e.*, a third party) and the user of the communications device provides consent for obtaining and transmitting location information about the communications device.  Unlike the patents of *Wireless Media Innovations*, the claims of the patents-in-suit provide for an open system for multi-channel, real-time tracking of vehicles and freight nationwide.

Further, MacroPoint agrees that the claims in *Wireless Media Innovations* could be performed solely by a human using pencil and paper.  The claims of the patents-in-suit, however, cannot be performed solely by a human.  The claims at issue here, unlike the claims in *Wireless Media Innovations*, utilize technology to solve technological issues encountered in the industry. It is telling that FourKites does not attempt to show how the specific claim language at issue here equates to the claim language in *Wireless Media Innovations*.  FourKites' bare assertions without factual or legal support do not satisfy FourKites' heavy burden.  Thus, FourKites' Motion to Dismiss should be denied.

---

[7] Limitations of the claims of the patents-in-suit are discussed in Section III(C) of this Memorandum.

c.      The cases cited by FourKites are inapposite

FourKites asserts that patent law has changed since this Court denied the motion to dismiss in *Progressive Cas. Ins. Co.*.  (Mot. To Dismiss, D.I. 18, at p. 10.)  FourKites, however, fails to address the fact that the subject matter of the patents-in-suit was examined, granted, and issued under the new patent law.  FourKites also suggests that this Court's reasoning in *Progressive Cas. Ins. Co.* no longer is valid.  FourKites is again wrong.  The Court's reasoning in *Progressive Cas. Ins. Co.* remains valid and is equally applicable here because the subject matter of the patents-in-suit was examined, granted, and issued under the most current patent law.  Moreover, FourKites has not cited any cases challenging this Court's reasoning in *Progressive Cas. Ins. Co*.  Thus, the presumption of validity, the clear and convincing standard, and the defendant's burden applied in *Progressive Cas. Ins. Co.* are applicable here.

FourKites devotes over two pages of its Motion to a rote, unexplained list of twenty-five cases where patents were invalidated at the pleadings stage without making any effort to explain how the cases are applicable or even analogous to the facts of this case.  (*Id.* at pp. 11-13.)  This is akin to listing guilty verdicts in twenty-five criminal cases and arguing that the 26th accused defendant is necessarily guilty as well with no further proceedings warranted.  A review of the listed cases reveals a glaring and fatal distinction.  In the listed cases, all of the challenged patents were issued prior to both the *Alice* decision and the issuance of the PTO's corresponding examination guidelines.  Here, the subject matter of the challenged patents was examined, granted, and issued under the post-*Alice* patent rules.  In fact, FourKites does not cite a single case where a court invalidated a patent as an abstract idea that was examined and issued post-*Alice*.  Thus, all of the cases cited by FourKites are inapposite here.

It goes without saying that the patents-in-suit must be evaluated on their own merits. FourKites' listing of cases void of any analysis carries no weight.  Consequently, FourKites has

14

failed to satisfy its burden, and its Motion to Dismiss should be denied.

     C.      Standard For Patent-Eligible Subject Matter – The Two-Part Test

35 U.S.C. § 101 states, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." There are three exceptions to § 101's broad patent-eligibility principles: "laws of nature, natural phenomena, and abstract ideas." *Alice,* 134 S. Ct. at 2358. FourKites alleges that the third category, abstract ideas, is applicable to the patents-in-suit.

The Supreme Court observed that the "concern that drives the exclusionary principle [i]s one of pre-emption." *Id.* at 2354 (citing *Bilski v. Kappos,* 561 U.S. 593, 612 (2010) (explaining how upholding the patent "would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea")). The Supreme Court has repeatedly emphasized that preemption is a concern where the patent would inhibit "further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Alice,* 134 S. Ct. at 2354 (citing *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 132 S. Ct. 1289, 1301 (2012)). While preemption is a major concern for the Supreme Court, the weighing of the preemptive effect must be analyzed carefully, and courts must "tread carefully lest it swallow all of patent law." *Id.* (citing *Mayo*, 132 S. Ct. at 1293-94 ("too broad an interpretation of this exclusionary principle could eviscerate patent law.")). "For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* Therefore, even patent claims that grow out of an abstract concept are not deemed ineligible on that basis alone. *Id.* (internal citation omitted). Indeed, inventions that are "applications of such concepts to a new and useful end … remain eligible for patent protection." *Id.* (internal citation omitted). Accordingly, in applying the § 101 exception, courts must distinguish between patents

15

that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention. *Id.*

Keeping this balance in mind, the Supreme Court established a two-part test for distinguishing between "those patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, courts must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355. If the claims are directed to a patent-ineligible concept, then courts must conduct an analysis to search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself. *Id.* (internal citation and quotations omitted). In doing so, the court must consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application. *Id.* (internal citation omitted).

      1.    <u>FourKites Fails to Demonstrate that the Claims Preempt the Field of Tracking Freight with a Computer</u>

The explicit motivating rationale behind the Supreme Court's decisions in *Alice* and *Mayo* was to recognize that validity of patent claims covering *only* abstract ideas and that add too little to the ineligible subject matter effectively would preempt all uses of that subject matter "tying up the future use of these building blocks of human ingenuity." *Alice,* 134 S. Ct. at 2354; *see also, Mayo Collaborative Servs.*, 132 S. Ct. at 1301. FourKites fails to address this critical consideration in its Motion. FourKites' omission is understandable because the claims of the patents-in-suit clearly do not preempt "tracking freight using a computer," the abstract idea that FourKites asserts is claimed by the patents-in-suit. (Mot. To Dismiss, D.I. 18, at p. 1.)

The claims of the patents-in-suit recite a technology for tracking vehicles and freight in a

specific and novel way.  The patents-in-suit claim systems and methods for obtaining or monitoring the location of a vehicle or freight utilizing a communications device correlated to the vehicle or freight, where the location of the communications device is received from a third party and the user of the communications device provides consent for obtaining and transmitting location information about the communications device.  The claims of the patents-in-suit include limitations that substantially narrow the claims, which prevents preemption and allows for the practice of other solutions for "tracking freight with a computer" to be practiced.  It simply would be absurd to contend that the validity of the claims of the patents-in-suit would somehow preclude others from using computer technology to track vehicles or freight.

By definition, systems and methods for tracking freight existing prior to the conception of the claims of the patents-in-suit are not preempted because they are prior art.  Lists of such prior art systems and methods are found on the face of the patents-in-suit.  Further, the Specification of the patents-in-suit includes discussion of conventional systems for monitoring vehicle location that rely only on global positioning systems (GPS).  (*See* '943 patent at 1:31-36.)

FourKites' Motion itself provides an example of a system and method that is not preempted by the claims of the patents-in-suit – a uFollowit Voice Proof of Delivery & Tracking Service ("uFollowit Service").  In a misguided and premature attempt to argue the claims of the patents-in-suit are invalid as anticipated or obvious, FourKites holds out the uFollowit Service as "just one prior art example, among many other references."  (Mot. To Dismiss, D.I. 18, at p. 21, n. 3.)  Predictably, FourKites misses its mark in citing the uFollowit Services as material or invalidating prior art because any company or entity can "track freight using a computer" using the system and method of the uFollowit Services without falling within the scope of the patents-in-suit.  The uFollowit Service relies on generating "Proof of Delivery (POD) with recipient's

voice signature" resulting in "Tracking with: "Voice POD & Text Name of Consignee." (*See* Ex. 8[8], uFollowit Services presentation at p. 2.)  Such a system and method of tracking freight is very different from those claimed by the patents-in-suit.  Thus, FourKites' own premature citation to "prior art" illustrates how the claims of the patents-in-suit ***do not preempt*** other solutions for "tracking freight using a computer."

          2.    <u>The Claims of the Patents-in-Suit are Directed to more than an Abstract Idea</u>

FourKites asserts that the claims of the patents-in-suit are "directed to the abstract idea of tracking freight."[9]  (Mot. To Dismiss, D.I. 18, at p. 13.)  FourKites is wrong.  FourKites offers varying but cursory descriptions of the ninety-four claims of the patents-in-suit, including:

> "nothing more than using computers to send, receive, and correlate information" (*id*. at pp. 4, 6);

> "all of the claims of the patents-in-suit recycle some combination of seven basic components, each of which are addressed herein: (1) sending / receiving; (2) correlating; (3) using or not using GPS; (4) exposing and/or interfacing with an exposed application programming interface; (5) specifying who is the location information requester; (6) specifying who provides the location information; and (7) displaying a representation of the location information" (*id*. at pp. 7, 19);

> "The claims of the patents-in-suit are directed to the basic idea of tracking freight: (1) receiving a request for the location of freight; (2) asking the truck in possession of that freight where it is; and (3) reporting the location of the truck." (*id*. at p. 14);

> "The claims 'use' a computer, but they are nothing more than a method of organizing a prior-existing, basic human activity." (*id*.); and

> "an effort to patent the performance of a task that humans have always done" (*id*. at p. 16).

While the patents-in-suit solve problems relating to "tracking freight," FourKites grossly over-

---

[8]  The uFollowit Services presentation was downloaded from <u>http://www.ufollowit.com/pdf/uFollowitv2.1.pdf</u> on September 10, 2015.

[9]  Defendant does not offer any specifics or detailed claim analysis in its § 101 argument and treats all claims—from any of the patents, independent and dependent, method and system—collectively and as "not substantively different."  (*See, e.g.,* Mot. To Dismiss, D.I. 18, at p. 3.)

simplifies the claims in an obvious and futile attempt to make it all seem as merely an abstract idea.  FourKites once again is wrong.

Merely condensing the claims to some abstract concept as FourKites has done is improper and does not follow the *Alice* two-part test.  By offering nothing other than several conclusory catch phrases, FourKites renders *Alice's* first part superfluous.  In fact, the Supreme Court specifically cautioned against such an approach when it observed that "[a]t some level, all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Alice*, 134 S. Ct. at 2354 (internal citation and quotation omitted).  The Supreme Court further advises that "we consider the elements of each claim both individually and as an ordered combination."  *Id*. at 2355 (internal citation and quotations omitted).  Although FourKites cites this very language in its Motion (Mot. To Dismiss, D.I. 18, at p. 9), it does not follow the Supreme Court's guidance and improperly analysis the claims.

In its cursory summation of the claims of the patents-in-suit, FourKites ignores the claims' detailed limitations, none of which simply recite the actions of "sending," "receiving," or "correlating."  By way of illustration only, claim 1 of the '943 patent does not simply claim "sending," it claims transmitting signals to very specific parties, with very specific information, and yielding very specific results:

> transmitting to the communications device a second signal including data that prompts an automated message to be communicated to a user of the communications device, the automated message representing a notice communicating to the user of the communications device that the location information of the communication device will be obtained; and

> transmitting a fourth signal to a location information provider, the fourth signal including data representing a request for location information of the communications device, wherein the location information provider corresponds to a party or device other than the communications device and the location information provider corresponds to at least one of: a wireless service provider providing wireless service to the communications device, a third party that obtains the location information of the communications device from the wireless service

provider providing wireless service to the communications device, and a party that has access to the location information of the communications device but is other than the wireless service provider or the third party that obtains the location information of the communications device from the wireless service provider.

('943 patent at 21:1-29.)  The first limitation requires that a signal is transmitted to a communications device that prompts an automated message that notifies the user of the device that location information for the device will be obtained.  The second limitation requires that a signal is transmitted to a specifically defined "location information provider," which requests the location of the communications device.  FourKites' reduction of these two limitations recited above to simply "sending" demonstrates the futility of its arguments.  In fact, claim 1 alone includes an additional six limitations above and beyond the two listed above.  Again, FourKites treatment of the claims of the patents-in-suits can in no way meet the standards for finding claims invalid as set forth in *Alice*.

Further, not only does FourKites' oversimplified characterization of the claims of the patents-in-suit hide meaningful limitations of the claims, it also obscures the import of those limitations.  For example, claim 1 of the '943 patent provides that the freight's current location is obtained not by a direct query as to where the freight is located, but by an indirect query to a location information provider as to the location of a communications device, which is correlated to the freight.  (*See* '943 patent at 20:65; 21:30-36; 22:15-23; and 35-38.)  The '943 patent's detailed description discloses these limitations and explains their technical importance.  For example, the '943 patent discloses the cost savings of indirect location monitoring which does not require the purchase and installation of dedicated monitoring equipment in each vehicle. (*See, e.g., id*. at 1:26, 33-45.)

Moreover, FourKites' analysis is inaccurate.  FourKites asserts that the "claims of the patents-in-suit are directed to the basic idea of tracking freight: (1) receiving a request for the

20

location of freight; (2) ***asking the truck in possession of that freight where it is***; and (3) reporting the location of the truck." (Mot. To Dismiss, D.I. 18, at p. 14, emphasis added.)  The claims of the patents-in-suit do not "ask a truck in possession of freight where it is."  As previously discussed, location information of the communications device is obtained from the location information provider to indirectly determine location of a vehicle or freight.  The claims specifically define what is a location information provider, and it clearly is not a truck as FourKites misleadingly asserts.  Therefore, not only is FourKites' analysis cursory, simplistic, and unpersuasive, it is just plain wrong.

In evaluating the patents at issue in *Alice v. CLS Bank,* the Federal Circuit stated that an abstract idea is a "disembodied concept … untethered from any real-world application."  *CLS Bank Int'l v. Alice Corp. Pty*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (internal citation and quotations omitted).  Even the most cursory examination of the claims of the patents-in-suit reveals that the subject matter claimed is very much tethered to real-world applications by limiting the claims to indirectly obtaining location information of a communications device from a location information provider and correlating that information to a vehicle or freight, providing notification, obtaining consent, and other operational functions and advantages.  The claims may be directed to tracking freight, but the claims are not directed to the general idea of tracking freight or the only way to track freight.  Instead, the claims are directed to specific ways of tracking freight that differ from and provide benefits over the prior art.

FourKites' cited authorities do not advance its arguments for invalidating the claims of the patents-in-suit.  Any comparison of the challenged claims here to the claims at issue in the decisions cited by FourKites reveal dramatic differences between the claims of the patents-in-suit and the claims found invalid in the cases cited by FourKites.  For instance, in *Alice* the claims

were directed to the fundamental economic practice of intermediate settlement; in *Bilski* the claims were directed to another fundamental economic practice of hedging of risk; in *Mayo*, the claims were directed to a law of nature regarding the administration of a drug, and in *Ultramercial* the claims were directed to using advertising as an exchange or currency.

All of the cases cited by FourKites, with the exception of *Mayo*, are directed to subject matter that can be characterized as "business methods." The identified "ideas" of these patents are in stark contrast to the claims of the patents-in-suit. Judge Mayer of the Federal Circuit, in his concurring opinion in *Ultramercial*, stated that *Alice* "for all intents and purposes, set out a technological arts tests for patent eligibility." *Ultramercial, Inc.* 772 F.3d at 717. Judge Mayer contrasted technological arts with "entrepreneurial" ones. *Id.* Indeed, most post-*Alice* validity decisions are so distinguished, with business method patents bearing the greatest scrutiny, while patents directed to the technological arts surviving such scrutiny.

Unlike the cases cited in FourKites' Motion, cases in which claims were directed to technological arts generally survive the two-part *Alice* test. In *DDR Holdings, LLC v. Hotels.com. L.P.,* 773 F.3d 1245 (Fed. Cir. 2014), the Federal Circuit held that a patent directed to an e-commerce outsourcing system for serving web pages offering commercial opportunities is patent-eligible subject matter under 35 U.S.C. § 101. *Id.* at 1259. "These claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257.

In *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, 2015 U.S. Dist. LEXIS 49408 (D. Del. Apr. 15, 2015), the patent at issue is directed to methods for using a computer system to

facilitate two-way communication between a mobile device and an internet server.  *See id* at *7. The patent "is directed to a problem unique to text-message telecommunication between a mobile device and a computer. The solution it provides is tethered to the technology that created the problem."  *Id* at 15-16.  The court found that like in *DDR Holdings*, the claim at issue "is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. at 15.

Here, the claims of the patents-in-suit is securely tethered to a tangible idea of a particular way to obtaining the location of a vehicle or freight.  Thus, the patents-in-suit are directed to patent-eligible subject matter.

### 3.  The Claims of the Patents-in-Suit Pass the Second Part of the *Alice* Test

Although FourKites has failed to satisfy the first part of the *Alice* test, consideration of the second part of the *Alice* test further demonstrates the insufficiency of FourKites' arguments. The second part requires that, if the claims are directed to a patent ineligible abstract idea, the elements of each claim are considered—both individually and as an ordered combination—to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea.  *Alice*, 134 S. Ct. at 2355. This second part is a search in the claims for an "inventive concept."  *Id.*  The "inventive concept" ensures that the claims at issue amount to "significantly more" than a patent on the ineligible concept itself.  *Id.*

Federal Circuit Judge Mayer in his concurring opinion in *Ultramercial* explained, in order to satisfy the technological arts tests set forth in *Alice*, "claims must harness natural laws and scientific principles … [and] use them to solve seemingly intractable problems." *Ultramercial*, at 721-722.   The Federal Circuit's *DDR Holdings* decision highlights the importance of solving a technological problem in the second part of the *Alice* test in determining whether the claims individually and as a whole recited an inventive concept.  *DDR Holdings,*

773 F.3d at 1255-59.  The claims of the patents-in-suit include a number of inventive concepts.

a.      A First Inventive Concept – Correlation of Location Information of a Communications Device to Location of the Freight or a Vehicle

The patents-in-suit disclose that "[c]onventional systems for monitoring vehicle location have relied on global positioning systems (GPS) to provide the vehicle's location.  Moreover, some of these systems require the installation of additional dedicated equipment in each vehicle." (*See* '943 patent at 1:31-36.)  These systems required each vehicle to have a dedicated GPS receiver installed in the vehicle. (*Id.*)  This is a costly proposition and, as such, many vehicles carrying freight do not have a GPS receiver attached to the vehicle.  Even within a single freight company, some vehicles may be equipped with GPS receivers while others are not.  The technological challenge is how to monitor the location of the freight or vehicle by technical means other than a dedicated GPS receiver installed in the vehicle.

The claims of the patents-in-suit include the inventive concept of correlating the location information of a communications device with the location of freight or a vehicle.  For example, claim 1 of the '943 patent recites the following limitations:

correlating the freight to a communications device;

receiving a first signal including data representing a request for information regarding the location of the freight;

transmitting a fourth signal to a location information provider, the fourth signal including data representing a request for location information of the communications device, wherein the location information provider corresponds to a party or device other than the communications device and the location information provider corresponds to at least one of . . . :

receiving a fifth signal from the location information provider, the fifth signal including data representing the location information of the communications device;

correlating the location information of the communications device to the location of the freight based at least in part on the correlation between the freight and the communications device; and

24

transmitting a sixth electronic signal including data representing the location of the freight.

('943 patent at 20:63-21:38.)

Claim 1 provides a technical solution to the technical problem of how to monitor the location of the freight or vehicle by technical means other than a dedicated GPS receiver installed in the vehicle.  This is accomplished by discerning the location of the freight or the vehicle without requiring a dedicated GPS receiver installed in the vehicle. The technical solution of claim 1 discerns the location of the freight or the vehicle by obtaining the location of a communications device from a location information provider and correlating the communication device's location information to that of the freight or vehicle.

Additionally, claims 2 and 3 of the '943 patent respectively recited:

the location information of the communications device is originally obtained using a method including a technique other than a technique utilizing a global position system (GPS) satellite receiver that forms part of the communications device; and

the location information of the communications device is originally obtained using a method including at least one of: advance forward link trilateration (AFLT), observed time difference (OTD), Cell-ID (CID), and a range of locations corresponding to a transmission range of a single radio tower.

(*See also* claims 3 and 4 of the '295 patent, claim 4 of the '097 patent, claims 3-4 and 13-14 of the '098 patent and claim 4 of the '313 patent.)

The claims provide technical solutions to the technical problem regarding how to monitor the location of freight or vehicles by means other than a dedicated GPS receiver installed in the vehicle and the claims set out precise sets of instructions for achieving the solution.  Thus, the claims provide an inventive concept above and beyond a mere abstract idea.

Further, the PTO found that the claims included an inventive concept. Among its Reasons for Allowance, the PTO states that the prior art of record fails to teach or render obvious, alone

or in combination, the unique claim combinations including, for the '295, '097, '098, and '313 patents:

> correlating the location information of the communications device to the location of the at least one of the vehicle or the freight carried by the vehicle based at least in part on the correlation of the at least one of the vehicle or the freight carried by the vehicle to the communications device; and transmitting a location signal including data representing the location of the at least one of the vehicle or the freight carried by the vehicle.

(*See* Ex. 5 at p. 9.)  Through this statement, the PTO indicates that these aspects of the claims are inventive.  This inventive concept provides "substantially more" than just the purportedly abstract idea of "tracking freight with a computer."

> **b.**  A Second Inventive Concept – Obtaining Location Information of Communications Device from a "Location Information Provider" – a Party or Device Other than the Communications Device.

Another technical problem to be solved is handling trucks and drivers of trucks that do not have uniform equipment.  Some trucks are equipped with dedicated GPS units and some are not.  Some truck drivers carry smartphones, while other truck drivers carry older cell phones (such as a "flip phone").  Each of these categories of devices use different techniques to facilitate location tracking.  GPS units use GPS techniques; flip phones, which do not have a GPS receiver, use cellular techniques; and smartphone can use a mixture of GPS, cellular and wireless techniques.  Due to the nature of GPS location systems, determining location via GPS is not always reliable.  For example, a truck and hence the GPS unit or smartphone may be indoors (*e.g.*, warehouse, hangar, etc.), under a bridge or in some other location where satellite reception is limited or impossible.  It is advantageous for a system to not only include GPS techniques, but also include additional techniques so that flip phones and smartphones can be efficiently used for location tracking.

Hence, the additional technical challenges that needed to be solved included:  1) how to

26

monitor the location of the freight or vehicle by technical means that do not rely exclusively on GPS; and 2) how to manage multiple channels providing location information (*i.e.*, dedicated GPS units, smartphones, flip phones, etc.).

The claims of the patents-in-suit provide a technical solution to the additional technical challenge.  Importantly, the claims recite that the location information of the communications device is obtained from "a location information provider," which is defined in the claims as "a party or device other than the communications device."  (*See e.g.*, '098 patent, claims 1 and 2, 21:11-15 and 21:30-42.)  This technical solution allows for obtaining location information from multiple channels, and reducing reliance on GPS-enabled equipment and GPS techniques, resulting in a more robust and inclusive system.  Many of the independent and dependent claims go on to further define the "location information provider" and who or what, other than the communications device itself, is a location information provider.  The Specification of the patents-in-suit disclose detail regarding the claimed "location information provider."

This technical solution to the technological challenge – namely, how to monitor the location of freight or vehicles by technical means without relying directly on receiving GPS-based information to determine location of freight or a vehicle – corresponds to an additional inventive concept.

       c.    <u>Third Inventive Concept – Providing Notice and/or Consent to the User that Location Information of the Communications Device is being Obtained</u>

Once the location information of a communications device is obtained, specific privacy concerns and general awareness of privacy issues necessitated a solution that did not apply to prior art freight tracking systems,[10] thus, presenting a new technical challenge that required a

---

[10] Privacy concerns were not applicable to prior art freight tracking systems because these systems were mostly closed proprietary systems in which the party monitoring location owned the vehicles or otherwise had explicit right

new technical solution.  The privacy concerns are discussed at some length in the Specification of the patents-in-suit. Essentially, privacy expectations require that the user be given notice that the location information of his or her communications device is to be obtained and that the user provides consent to the collection and use of the location information.

Providing notice to and obtaining consent from each user, whether an individual driver with a flip phone or smartphone or a trucking company with dedicated GPS devices on each truck, became a technical challenge requiring a novel solution.  Creating a system that manually or automatically called each user individually to provide notice and consent would have substantially hampered the utility of the invention. There could be thousands of users and many thousands of transactions making such a consent mechanism prohibitively inconvenient.  Thus, a technical challenge arose requiring a new solution — how to provide notice to and receive consent from all users in an efficient manner and in accordance with certain guidelines for smartphone users.

The claims of the patents-in-suit provide that technical solution to the additional technical challenge.  For example, claim 1 of the '943 patent provides:

> signal including data that prompts an automated message to be communicated to a user of the communications device, the automated message representing a notice communicating to the user of the communications device that the location information of the communications device will be obtained; and

> signal including data indicative of consent from the user to the obtaining of the location information of the communications device.

Several of the dependent claims further define how consent may be obtained from the user of the communications device. The Specification of the patents-in-suit also provide much detail regarding the providing notice and obtaining consent of the claims.

---

to monitor location of the freight or the vehicle. The inventive concept opened up location data to clients of the trucking company, shipper, brokers, etc. which raises privacy concerns.

The PTO agrees that the technical solution to the technological challenge of how to provide notice to and receive consent from the user according to the guidelines in an efficient manner corresponds to an inventive concept.  Among its Reasons for Allowance, the PTO states that the prior art of record fails to teach or render obvious, alone or in combination, the unique claim combinations including, for the '943 patent:

> a notification logic configured to generate a notification signal including data representing a notice indicating to the user of the communications device that consenting to revealing location of freight carried by the vehicle would result in the location information of the communications device being disclosed, wherein the communications interface is further configured to: transmit a fifth electronic signal to the communications device, the fifth electronic signal including at least one of the notification signal and data representing a request for the consent of the user of the communications device to revealing the location information of the communications device, and receive a sixth electronic signal including data representing the consent of the user of the communications device to revealing the location information of the communications device.

(*See* Ex. 5 at p. 2.)  For the '295, '097, '098, and '313 patents:

> receiving a signal including data that indicates that a user of a communications device consented to transmission of location information of the communications device.

(*See* Ex. 5 at p. 9.)  These statements are clear indications by the PTO that the notification and consent aspects of the claims are inventive; *i.e.*, the prior art does not "teach or render obvious, alone or in combination, the unique claim combinations."

This technical solution to the technological challenge of how to provide notice to and receive consent from all users in an efficient manner and in accordance with users' expectations corresponds to an additional inventive concept that provides substantially more than "tracking freight with a computer."  This inventive concept, as in *DDR Holdings*, provides a solution to a technical problem that is unique and "tethered to the technology that created the problem."  *DDR Holdings*, 773 F.3d at 15-16.

Each of these three technical solutions explained above *by itself* provides an "inventive

29

concept" that is separate from and beyond the concept of "tracking freight with a computer," and thus, provides "substantially more" as prescribed by *Alice*.  That the asserted claims here provide not one but at least three inventive concepts conclusively put to rest the § 101 patentable subject matter issue. The claims of the patents-in-suit are patent-eligible subject matter.

## IV.    CONCLUSION

For the foregoing reasons, MacroPoint respectfully requests that the Court deny FourKites' Motion to dismiss the First Amended Complaint.

Dated: September 15, 2015                    Respectfully submitted,

/s/*Risto Pribisich*
Risto Pribisich (0081758)
Michael Sherban (0079950)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
200 Public Square
Suite 2300
Cleveland OH  44114 2378
Telephone:  (216) 363 4500
Facsimile:  (216) 363-4588
Email:  rpribisich@beneschlaw.com
Email:  msherban@beneschlaw.com

Timothy J. Coughlin (0019483)
Carolyn M. Cole (0092530)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114
Telephone:  (216) 566-5500
Facsimile:  (216) 566-5800
Email: tim.coughlin@thompsonhine.com
Email: hope.lu@thompsonhine.com

*Attorneys for Plaintiff MacroPoint, LLC*

31

## __CERTIFICATION__

The present case has not yet been assigned to a track.  The Court granted a motion on July 31, 2015, granting permission for this Memorandum filed in opposition to Defendant's Motion to Dismiss the First Amended Complaint to be up to thirty pages in length.  The undersigned herby certifies that he length of this Memorandum complies with the Court's Order.


/s/*Risto Pribisich*         
*One of the Attorneys for Plaintiff*
MacroPoint, LLC

**CERTIFICATE OF SERVICE**

A copy of the foregoing is being filed this 15th day of September, 2015 and is being served upon counsel of record by operation of the Court's electronic filing system.

/s/*Risto Pribisich*
*One of the Attorneys for Plaintiff*
MacroPoint, LLC