**UNITED STATED DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MacroPoint, LLC, | Case No. 1:15cv1002 |
| Plaintiff, | Judge Patricia A. Gaughan |
| v. | |
| FourKites, Inc., | |
| Defendant. | |

**REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.  The Patent Office's "Seal of Approval" Does Not Save MacroPoint's Patents ......................2

   a.  Every Patent Challenged in Court Passed Muster at the Patent Office ...........................2
   b.  Post-*Alice* Issuance is Not Significant ...............................................................2

       i.  MacroPoint's Timing Argument Lacks Any Legal Foundation...........................3
       ii.  Subject Matter Eligibility Did Not Suddenly Change in 2014............................4
       iii.  There Is No Evidence in the Record that the Examiner Actually
          Considered § 101 .......................................................................6
       iv.  The Patent Office's Guidance Has No Legal Weight ............................................7
       v.  The Patents-in-Suit Fail Under the Patent Office's Guidance..............................7

II.  All the Claims of All the Patents-in-Suit Are Invalid ..........................................12

   a.  FourKites Is Not Arguing That All Software Claims are Ineligible ...............................12

       i.  *DDR*-type Software Claims are Eligible ..........................................12
       ii.  Claims of the Patents-in-Suit Are Not *DDR*-type Software Claims ....................14
       iii.  MacroPoint's "Expert" Cannot Rewrite the Claims ............................................15
       iv.  MacroPoint's Contentions and Public Statements Belie Its Current
          Characterization of the Patents-in-Suit ..........................................18

   b.  Applying the *Mayo*/*Alice* Framework, the Claims of the Patents-in-Suit Are
     Directed to Patent Ineligible Subject Matter.....................................................19

       i.  Step One – The Patents-in-Suit Claim an Abstract Idea. .....................................19
       ii.  Step Two – The Patents-in-Suit Lack an Inventive Concept ..............................20

III. FourKites' Reliance On Representative Claims is Proper......................................26

IV. The Patents-in-Suit Are Invalid Even Under MacroPoint's Preferred Standards...................27

V.  This Case Should Be Resolved in Favor of FourKites Without Further Delay......................29

   **Conclusion** ...........................................................................**30**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
　728 F.3d 1336 (Fed. Cir. 2013)................................................................15

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
　788 F.3d 1371 (Fed. Cir. 2015)................................................................18

*Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*,
　133 S. Ct. 2107 (2013) .............................................................................5

*AstraZeneca LP v. Breath Ltd.*,
　No. 08-1512, 2015 WL 777460 (D.N.J. Feb. 13, 2015)...........................4

*In re Bilski*,
　545 F.3d 942 (Fed. Cir. 2008)............................................................5, 19

*Bilski v. Kappos*,
　561 U.S. 593 (2010) ..........................................................5, 18, 19, 29

*Blue Spike, LLC v. Google Inc.*,
　No. 14-CV-01650-YGR, 2015 WL 5260506 (N.D. Cal. Sept. 8, 2015)...............................28

*buySafe, Inc. v. Google, Inc.*,
　765 F.3d 1350 (Fed. Cir. 2014)............................................................5, 19

*Carfax, Inc. v. Red Mt. Technologies*,
　1:14-CV-01590-GBL, 2015 WL 4740513 (E.D. Va. Mar. 30, 2015)....................................29

*Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*,
　776 F.3d 1343 (Fed. Cir. 2014)........................................................5, 19, 27

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*,
　558 Fed. App'x 988 (Fed. Cir. 2014) ......................................................21

*CyberSource Corp. v. Retail Decisions, Inc.*,
　654 F.3d 1366 (Fed. Cir. 2011)................................................................28

*DDR Holdings, LLC v. Hotels.com, L.P.*,
　773 F.3d 1245 (Fed. Cir. 2014).............................................. 12, 13, 14, 19

*Dealertrack, Inc. v. Huber*,
　674 F.3d 1315 (Fed. Cir. 2012)................................................................16

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
　412 F.3d 1291 (Fed. Cir. 2005)................................................................16

*Everglades Game Techs., LLC v. Supercell, Inc.*,
    No. 14-643, at *3-6 (D. Del. Aug. 21, 2015) .......................................................................28

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) ...............................................................................20, 25

*Kenexa BrassRing, Inc. v. Hireability.com, LLC*,
    No. 12-10943, 2015 WL 1943826 (D. Mass. Apr. 28, 2015) .................................................20

*KSR International Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ...............................................................................................3, 4

*Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*,
    No. 14-cv-4957, 2015 WL 3637740 (N.D. Ill. June 12, 2015) .........................................16, 17

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005)....................................................................................2

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.*,
    No. 14-732, 2015 WL 1744343 (D. Del. Apr. 15, 2015) ...............................................14, 19

*Microsoft v. i4i Ltd.*,
    131 S. Ct. 2238 (2011) .......................................................................................28, 29

*MicroStrategy Inc. v. Apttus Corp.*,
    No. 3:15-cv-21, 2015 WL 4425828 (E.D. Va. July 17, 2015) ............................................29

*Mikkilineni v. Stoll*,
    410 Fed. App'x 311 (Fed. Cir. 2010) ............................................................................7

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015)..............................................................................18, 29

*Planet Bingo, LLC v. VKGS LLC*,
    576 Fed. App'x 1005 (Fed. Cir. 2014) ..........................................................................17

*Progressive Casualty Ins. Co. v. SafecoIns Co.*,
    No. 10-cv-1370, 2010 WL 4698576 (N.D. Ohio Nov. 10, 2010).........................................4, 5

*Sciele Pharma Inc. v. Lupin Ltd.*,
    684 F.3d 1253 (Fed. Cir. 2012)..................................................................................29

*Shortridge v. Found. Constr. Payroll Serv., LLC*,
    No. 14–cv–04850–JCS, 2015 WL 1739256 (N.D.Cal. Apr. 14, 2015) ..................................23

*State Contracting & Engr. Corp. v. Condotte Am., Inc.*,
    346 F.3d 1057 (Fed. Cir. 2003)...................................................................................28

*In re TLI Commc'ns LLC Patent Litigation*,
    No. 14MD2534, 2015 WL 627858 (E.D. Va. Feb. 6, 2015) ...........................................28, 29

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014)........................................................................*passim*

*Univ. of New Mexico v. Knight,*
    321 F.3d 1111 (Fed. Cir. 2003)...............................................................................7

*Wolf v. Capstone Photography, Inc.,*
    No. 2:13–CV–09573, 2014 WL 7639820 (C.D. Cal. Oct. 28, 2014) ....................27

**Statutes**

35 U.S.C. § 101...........................................................................................................*passim*

35 U.S.C. § 102......................................................................................................... 6, 29

35 U.S.C. § 103......................................................................................................... 6, 29

35 U.S.C. § 282.............................................................................................................28

**Other Authorities**

79 Fed. Reg. at 74621 ............................................................................................8, 9, 10

79 Fed. Reg. at 74691 .....................................................................................................7

MPEP §§ 701 *et seq.* .......................................................................................................6

MPEP § 804.02 ................................................................................................................6

View of the Supreme Court Decision in KSR International Co. v. Teleflex Inc., 72
    Fed. Reg. 57526 (Oct. 10, 2007)...........................................................................4

Nothing in MacroPoint's opposition papers changes the fact that all of the claims of all of the patents-in-suit are directed to an abstract idea and are invalid under 35 U.S.C. § 101. MacroPoint attempts to persuade the Court otherwise by focusing substantially on the fact that four of the five patents-in-suit issued after *Alice* and after the Patent Office issued some of its interim guidance interpreting *Alice*.  To make its argument, MacroPoint arbitrarily selects December 2014 as the date after which it claims that the Patent Office was properly applying *Alice*.  MacroPoint conveniently fails to apprise the Court, however, of the inconvenient fact that the Patent Office issued additional *Alice* guidance in July 2015, after the issuance of all of the patents-in-suit.  Ultimately, the date the patents-in-suit issued has no legal significance in this context.  It is well-settled that the courts determine invalidity, and that the law of subject-matter eligibility is the same for all patents, regardless of when they issued.  Any suggestion that the patents-in-suit deserve greater deference is a misstatement of the law.

Much of the remainder of MacroPoint's brief focuses on alleged innovations that bear no resemblance to the actual patent claims at issue.  Rather than defend the eligibility of the actual claims of the patents-in-suit, MacroPoint attempts to rewrite them through attorney argument and improper declarations.  This too misses the mark.  Each of the claims fails the requisite *Mayo*/*Alice* test because: (1) each is directed to the abstract idea of tracking freight; and (2) none includes an inventive concept that transforms it into a patent-eligible application.  Indeed, case law establishes that the alleged inventive concepts identified by MacroPoint are nothing more than routine computer functions that cannot be the basis for eligibility under § 101.

Tellingly, nowhere in MacroPoint's opposition does it argue that now is not the time to decide this issue.  MacroPoint did not identify any alleged disputed fact questions to be explored through discovery, and MacroPoint did not suggest questions of claim construction for

consideration at a *Markman* hearing.  Although MacroPoint did argue that the patents-in-suit are presumed valid and that ineligibility must be demonstrated by clear and convincing evidence— issues on which district courts are divided—the Court need not resolve those conflicts because the patents-in-suit are invalid even under those standards.  Therefore, the Court should grant FourKites' motion and enter judgment that all of the claims of all of the patents-in-suit are invalid under 35 U.S.C. § 101.

## I.  The Patent Office's "Seal of Approval" Does Not Save MacroPoint's Patents.

### a.    Every Patent Challenged in Court Passed Muster at the Patent Office.

MacroPoint attempts to avoid a finding of invalidity by pointing to the Patent Office having previously issued the patents.  The argument, tried and true, is a red herring.  Indeed, if the Patent Office had the final word on whether a patent was valid, MacroPoint's argument that the Patent Office "already determined the claims of the patents-in-suit not only are directed to patent-eligible subject matter . . . but patentable under all legal requirements" might have some practical or even legal effect.  The reality, however, is that the Patent Office necessarily approved every patent that this or any other district court has been asked to assess under *Alice*.  If the Patent Office did not issue invalid patents, there would be substantially less patent litigation. The patents-in-suit are no different.  They are as deserving of the same scrutiny as any other issued patent.[1]

### b.    Post-*Alice* Issuance is Not Significant.

MacroPoint repeatedly claims that the Patent Office "already determined" (MacroPoint

---

[1] *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005) is instructive here. There, after the district court found the patent-in-suit invalid as anticipated, the patentee moved to amend the judgment citing the Patent Office having issued a notice of allowance on a similar patent application.  *Id.* at 1321–22.  The district court denied the motion, and the Federal Circuit upheld that decision, noting that "a court is not bound by the PTO's actions and must make its own independent determination of patent validity."  *Id.* at 1322.

Br. at 2), or "previously considered" (*id.* at 10), whether the patents-in-suit overcome FourKites'
§ 101 argument. This  mischaracterizes the legal significance of when the patents-in-suit issued
(there is none) and the prosecution of the patents themselves (the Examiner never specifically
addressed a § 101 rejection).  All patents, no matter when they issue, must satisfy the same § 101
subject-matter eligibility test.  Nothing in the prosecution history indicates the Examiner applied
the *Alice*-related interim guidance to the patents-in-suit, as these patents were merely
continuations of a patent already issued pre-*Alice*.  Had the Examiner done so and done so
correctly, the patents-in-suit would have failed under that framework.  But even if they had
passed, the Patent Office's guidance is not conclusive, and the patents-in-suit would nonetheless
be invalid.

### i.      MacroPoint's Timing Argument Lacks Any Legal Foundation.

Without citation to any authority, MacroPoint's central argument is that the patents-in-
suit cannot be invalid under § 101 because the continuations issued after the Patent Office
published interim guidance interpreting the application of *Alice*.  MacroPoint would have this
Court arbitrarily draw a line in the sand on December 16, 2014, and ignore a wave of decisions
around the country holding similar patents invalid—simply because those invalid patents issued
before that interim date and some of MacroPoint's issued after.  If MacroPoint's theory had any
basis in the law modern patents would never be deemed invalid, and it would have cited earlier
applications of the theory following similar alleged shifts in patent law.  Of course, courts
regularly find patents invalid regardless of whether they were examined after Patent Office
guidance, including on the very issues cited in such guidance.

For one such example, in April 2007 the Supreme Court issued its unanimous decision in
*KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), which overruled the Federal

Circuit's application of the "teaching, suggestion, motivation" test for the analysis of obviousness. *Id.* at 421.  The Patent Office responded by issuing interim guidance interpreting the decision and advising examiners about the application of its principles.[2]  This interim guidance did not, though, foreclose courts from invalidating patents as obvious based on *KSR*, notwithstanding those patents issued after the publication of *KSR* and the Patent Office's guidance to examiners.  *See, e.g., AstraZeneca LP v. Breath Ltd.*, No. 08-1512 (RMD/AMD), 2015 WL 777460, at *6–7, *59 (D.N.J. Feb. 13, 2015) (finding patent issued in April 2009 invalid under *KSR*) *aff'd* 603 Fed. App'x 999 (2015).

The illegitimacy of MacroPoint's argument is further illustrated by the Patent Office's continuing publication of additional guidance.  MacroPoint contends its patents are necessarily valid under § 101 because they post-date the Patent Office's December 2014 guidance.  But as MacroPoint's expert Mr. Kunin recognizes, the Patent Office issued additional guidance in July 2015—after all of MacroPoint's patents issued or received their notices of allowance.  *See* Ex. 4 to Resp. at ¶ 15.  Under MacroPoint's own theory, the patents-in-suit were not examined under the most current Patent Office guidance.  MacroPoint draws an arbitrary line at December 2014 because its argument is a litigation-driven creation without any basis in law.  The patents-in-suit are subject to the same legal analysis as any other patent, whether issued before or after *Alice*, the December 2014 guidance, the July 2015 guidance, or any other subsequent guidance.

     **ii.**     **Subject Matter Eligibility Did Not Suddenly Change in 2014**.

As the Court is aware, *see Progressive Casualty Ins. Co. v. SafecoIns Co.*, No. 10-cv-1370, 2010 WL 4698576, at *1–6 (N.D. Ohio Nov. 10, 2010), invalidity under 35 U.S.C. § 101

---

[2] *See* Ex. A, Examination Guidelines for Determining Obviousness Under 35 U.S.C. 103 in View of the Supreme Court Decision in KSR International Co. v. Teleflex Inc., 72 Fed. Reg. 57526 (Oct. 10, 2007).

was an emerging issue long before the *Alice* decision in 2014.  The Federal Circuit *en banc* decision in *In re Bilski*, 545 F.3d 942 (Fed. Cir. 2008), instigated closer scrutiny of patents' subject-matter eligibility.  In 2010, the Supreme Court affirmed that decision while overruling its rationale.  *See Bilski v. Kappos*, 561 U.S. 593, 612–13 (2010).  The Supreme Court provided further guidance in 2012, in *Mayo Collaborative Services v. Prometheus Labs., Inc.*, fed132 S. Ct. 1289 (2012), and in 2013, in *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2013).

MacroPoint argues as though the Supreme Court changed the standard for subject-matter eligibility in 2014 with *Alice*, but that is not the case.  *See Alice*, 134 S. Ct. at 2354 (tracing the Court's subject-matter eligibility jurisprudence back "for more than 150 years").  What <u>has</u> changed since this Court's *Progressive Casualty* decision is the now unequivocal approval—even encouragement—for district courts to address this issue at the pleading stage.  *See* dkt. # 18, FourKites Br. at 10 ("Courts may have once questioned whether it was appropriate to hold patents invalid on a motion to dismiss, but that is no longer the case.").  The Federal Circuit has repeatedly affirmed district court decisions on motions to dismiss or for judgment on the pleadings.  *See buySafe, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (affirming district court's granting of motion for judgment on the pleadings based on § 101); *Content Extraction and Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014) (affirming district court's granting of motion to dismiss based on § 101); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (affirming district court's granting of motion to dismiss based on § 101).  Regardless of when the patents-in-suit issued, the standard for subject-matter eligibility is the same as for any other patent, and the time for evaluating the issue is now.[3]

---

[3]  MacroPoint combines its timing argument with a mischaracterization of FourKites'

### iii. There Is No Evidence in the Record that the Examiner Actually Considered § 101.

As MacroPoint's patent examination expert concedes, the Examiner never expressly addressed whether any of the claims of any of the patents-in-suit satisfied § 101.  *See* MacroPoint Br. at Ex. 4 at 4-5 ("I did not see any affirmative discussion of the claims by the examiners for satisfying the requirement of patent subject matter eligibility").  During prosecution, Examiners may issue objections or rejections based on their analysis of patent applications.  *See generally* MPEP §§ 701 *et seq.*

For example, during prosecution of the application that issued as the '943 patent, the Examiner rejected the proposed claims as violating the doctrine against obviousness-type double patenting, being anticipated under 35 U.S.C. § 102, and being obvious under 35 U.S.C. § 103.  Ex. B.[4]  In response, the applicant made arguments as to why the proposed claims were allowable.  Ex. C.  The Examiner considered the applicants' remarks and made new rejections under 35 U.S.C. § 103.  Ex. D.  After two phone interviews between the applicant and the Examiner, the Examiner withdrew the § 103 rejection and issued a notice of allowance.  Exs. E, F, G.  In the parlance of the Patent Office, the applicant "traversed" the Examiner's rejection.

Nowhere during the prosecution of the '943 patent did the Examiner make, nor did the

---

reliance on more than two dozen district court decisions since the beginning of this year that have held patents invalid at the pleading stage (even more have issued since then).  Except for where FourKites separately discussed certain of those cases, FourKites was not analogizing all of those cases to the patents-in-suit or arguing the Court should find the patents-in-suit "guilty by association."  Rather, FourKites was simply demonstrating that it is now routine to address the issue at this stage, a proposition that MacroPoint does not dispute, as it does not contend anywhere in its opposition that the Court should delay ruling on this issue pending discovery.

[4] Obviousness-type double patenting is a judicially created doctrine that bars an applicant from extending an original patent term by filing additional applications claiming subject matter that is not patentably distinct.  MPEP § 804.02.  The rejection is routinely made when a family of related applications is before the patent office, and an applicant can easily overcome the rejection by simply filing a terminal disclaimer.  *Id.*

applicant traverse, a § 101 rejection.  The prosecution history of the remaining patents-in-suit is even more sparse.  Having secured allowance of the '943 patent, MacroPoint filed a series of child applications.  Ex. H.  As discussed in FourKites' opening brief, each of these child applications merely shuffled claim elements of the '943 patent.  Unsurprisingly, each application received only a cursory examination—the Examiner made technical objections and rejected the claims based on double patenting in view of the previously allowed patents, but otherwise said the applications were allowable.  Ex. I.  MacroPoint fixed the technical objections, filed the terminal disclaimers, and the applications issued as the patents-in-suit.  Not once did the Examiner note a § 101 concern, so not once did MacroPoint have to even address this issue.

### iv.    The Patent Office's Guidance Has No Legal Weight.

Even if there was any indication that the Examiner had applied the Patent Office's interim guidance to the patents-in-suit, that would not foreclose FourKites' § 101 challenge.  The Patent Office's rules for the examination of applications are nothing more than a statement of internal procedures—they are not binding on this Court and do not have the force of law.  *See, e.g., Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1121 (Fed. Cir. 2003) ("The MPEP sets forth PTO procedures; it is not a statement of law."); *cf. Mikkilineni v. Stoll*, 410 Fed. App'x 311, 312 (Fed. Cir. 2010) (rejecting challenge to Patent Office's interim guidelines under the Administrative Procedure Act because "the Interim Guidelines are interpretive, rather than substantive"); *see also* Dec. 16, 2014 Interim Guidance, 79 Fed. Reg. at 74691 ("This Interim Eligibility Guidance does not constitute substantive rulemaking and does not have the force and effect of law.").

### v.    The Patents-in-Suit Fail Under the Patent Office's Guidance.

Although it does not argue in its brief that the patents-in-suit satisfy the Patent Office's

interim guidance, MacroPoint submits a 99-page declaration of a claimed "expert" witness that purports to analyze the subject-matter eligibility of the patents-in-suit.[5]  As discussed below, Mr. Zatkovich's analysis depends on his rewriting the written descriptions of the patents-in-suit and their claims.   A proper application of the interim guidance to the actual patents-in-suit, as written, demonstrates that all of the claims are invalid under § 101.



The Patent Office's interim guidance provides the flow chart at right for analyzing § 101 eligibility. 79 Fed. Reg. at 74621.  The first step in the inquiry is whether the claims of the patent are directed to a process, machine, manufacture or composition of matter.  Id.  In this case, all the claims of the patents-in-suit ostensibly recite either methods or machines.  See FourKites Br at. 3-7.

Next, the interim guidance asks if the claims are directed to a law of nature, natural phenomenon or an abstract idea.  79 Fed. Reg. at 74621.  The interim guidance provides examples of "the types of concepts courts have found to be abstract ideas . . . which are intended to be illustrative and not limiting."  Id. at 74622.  These include:

- Mitigating settlement risk;
- Processing information through a

_____

[5] Given the motion before the Court is to dismiss the complaint on the pleadings alone, MacroPoint's submission of an expert declaration is an improper attempt to go beyond the pleadings in this case.  The length of the declaration—45 pages pertain to Mr. Zatkovich's "analysis" of the patent-in-suit and his responses to FourKites' argument—is also a violation of the Court's order on page limits.  Finally, the propriety of Mr. Zatkovich's opinions about the subject-matter eligibility of the patents-in-suit—a legal question—is suspect given he is not a lawyer, patent examiner, or patent agent, but a computer scientist.  For at least these reasons, the Court should strike or at least refuse to consider Mr. Zatkovich's declaration in its entirety.

- Hedging;
- Creating a contractual relationship;
- Using advertising as an exchange or currency;

- clearinghouse;
- Comparing new and stored information and using rules to identify options;
- Using categories to organize, store and transmit information;

*Id.*

In this case, the abstract idea is stated by the claims themselves:

| Patent, Claim | Claim Language |
| --- | --- |
| '943 patent, claim 1 | A computer implemented method for <u>indicating location of freight</u> carried by a vehicle |
| '943 patent, claim 8 | A system for <u>obtaining location of freight</u> carried by a vehicle |
| '295 patent, claim 1 | A computer implemented method for <u>monitoring location of at least one of a vehicle or freight</u> carried by the vehicle |
| '295 patent, claim 8 | A system for <u>monitoring location of at least one of a vehicle or freight</u> carried by the vehicle |
| '097 patent, claim 1 | A method for a machine or group of machines to <u>monitor location of at least one of a vehicle or freight</u> carried by the vehicle |
| '097 patent, claim 8 | A method for a machine or group of machines to <u>monitor location of at least one of a vehicle or freight</u> carried by the vehicle |
| '097 patent, claim 15 | A machine or group of machines embodying a system for <u>monitoring location of at least one of a vehicle or freight</u> carried by the vehicle |
| '097 patent, claim 22 | A method for a machine or group of machines to <u>monitor location of at least one of a vehicle or freight</u> carried by the vehicle |
| '098 patent, claim 1 | A method for a machine or group of machines to <u>monitor location of at least one of a vehicle or freight</u> carried by the vehicle |
| '098 patent, claim 11 | A machine or group of machines embodying a system for <u>monitoring location of at least one of a vehicle or freight</u> carried by the vehicle |
| '313 patent, claim 1 | A method for a machine or group of machines to <u>obtain and provide location of at least one of a vehicle or freight</u> carried by the vehicle |
| '313 patent, claim 9 | A method for a machine or group of machines to <u>monitor location of at least one of a vehicle or freight</u> carried by the vehicle |
| '313 patent, claim 15 | A machine or group of machines embodying a system <u>for monitoring location of at least one of a vehicle or freight</u> carried by the vehicle |

That is, all of the claims of the patents-in-suit are directed to the abstract idea of tracking freight.[6]

_____

[6] Mr. Zatkovich posits that the patents-in-suit are directed to "an open system architecture" as opposed to a "closed system." As discussed in further detail below, Mr. Zatkovich's analysis depends on his rewriting of the patents-in-suit. The phrase "open system architecture" is not recited anywhere in any of the patents-in-suit. Indeed, even the words "open" and "closed" do not appear in any of the patents-in-suit.

Next, the interim guidance asks if the claim recites additional elements that amount to significantly more than the abstract idea. 79 Fed. Reg. at 74621. The interim guidance provides examples of the types of "[l]imitations that may be enough to qualify as 'significantly more' when recited in a claim with" an abstract idea. *Id.* at 74624. These include:

- Improvements to another technology or technical field;
- Improvement to the functioning of the computer itself;
- Applying the [abstract idea] with, or by use of, a particular machine;

- Effecting a transformation or reduction of a particular article to a different state or thing;
- Adding a specific limitation other than what is well-understood, routine and conventional in the field, or adding unconventional steps that confine the claim to a particular useful application.

*Id.*

The interim guidance also provides examples of the types of "[l]imitations that were found not to be enough to qualify as 'significantly more' when recited in a claim with" an abstract idea. *Id.* These include:

- Adding the words "apply it" (or an equivalent) with the judicial exception, or mere instructions to implement an abstract idea on a computer;
- Generally linking the use of the judicial exception to a particular technological environment or field of use;
- Adding insignificant extrasolution activity to the judicial exception, e.g., mere data gathering in conjunction with a law of nature or abstract idea

- Simply appending well-understood, routine and conventional activities previously known to the industry, specified at a high level of generality, to the judicial exception, e.g., a claim to an abstract idea requiring no more than a generic computer to perform generic computer functions that are well understood, routine and conventional activities previously known to the industry.

*Id.*

All of the claims of the patents-in-suit recite tracking freight with the addition of the words "apply it" on a computer. *See, e.g.*, '943 patent, claim 1 ("A computer implemented method for" tracking freight); '097 patent, claim 15 ("A machine or group of machines embodying a system for" tracking freight); '313 patent, claim 1 ("A method for a machine or group of machines to" track freight). All of the individual elements of the claims recite nothing

10

more than information manipulation using generic computer functions. *See* FourKites Br. at 3-7 (summarizing the elements of all of the claims of the patents-in-suit).

None of the elements of the claims recite a limitation like the kind that could qualify as "something more." They certainly do not claim to "transform" a particular article into a different thing. They do not claim an improvement to another technology or technical field.[7] They do not claim an improvement to a computer itself, and they do not claim tracking freight with or by a particular machine. The patents-in-suit do not disclose an improved computer or a new freight tracking machine. They only teach an idea implemented across a collection of generic computer components.

Finally, the claims do not add a specific limitation other than what is well-understood, routine and conventional in the field, or add unconventional steps that confine the claim to a particular useful application. The patents-in-suit describe the idea of obtaining "consent" as so well-understood as to be the subject of published industry best practices and guidelines. The remaining elements of the claims amount to nothing more than well-known methods of sending, receiving, and processing information.[8] In short, there is nothing "more" in the claims that would make them patentable subject-matter.

Therefore, even under the Patent Office's interim guidance, all of the claims of the patents-in-suit would fail the eligibility framework.

---

[7] As discussed below, MacroPoint goes to great lengths to rewrite the patents as though they improved on the "technical field" of tracking freight. Alas, the interim guidance describes improving <u>another</u> technology or technical field—*e.g.*, applying the abstract idea of tracking freight to a new field (not tracking freight).

[8] As discussed below, MacroPoint attempts to rewrite the patents to describe a freight tracking system that is allegedly distinguishable from "conventional" freight tracking systems. Not only is this plainly a hindsight, litigation-driven effort, but the <u>claims</u> themselves are not directed specifically to any of the alleged improvements.

11

## II.     All the Claims of All the Patents-in-Suit Are Invalid.

The claims of the patents-in-suit recite the abstract idea of "tracking freight" on a computer without anything more that would make them patent eligible under 35 U.S.C. § 101.

### a.     FourKites Is Not Arguing That All Software Claims are Ineligible.

Contrary to MacroPoint's assertion, FourKites is not suggesting that all software patents are patent ineligible.  Neither the Supreme Court nor the Federal Circuit has adopted such a hard and fast rule, and FourKites is not asking this Court to go beyond existing precedent.

Notwithstanding that some software patents may be patent eligible, MacroPoint's software patents are not.  The alleged "invention" of the patents-in-suit is nothing more than an abstract idea, implemented in software, using generic computer components.  The claimed generic computer components do no more than conventional functions such as sending and receiving data between computers, storing and retrieving information in a computer, or correlating records in a standard relational database.  MacroPoint did not cite one case in which the Federal Circuit or the Supreme Court upheld such patent claims as reciting patent eligible subject matter.

### i.     *DDR*-type Software Claims are Eligible.

As the Federal Circuit explained in *DDR Holdings*, the "recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.  The bare fact that a computer exists in the physical rather than purely conceptual realm 'is beside the point.'"  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (quoting *Alice*, 132 S. Ct. at 1301).  But software claims may nonetheless be patent eligible so long as "they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet."  *Id.* at 1257.  Thus, software claims

may be patent eligible if "the <u>claimed solution</u> is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* (emphasis added).

In *DDR Holdings*, the Federal Circuit struggled to "identify[] the precise nature of the abstract idea" at issue, but ultimately upheld the claims as valid because "under any of these characterizations of the abstract idea, the . . . claims satisfy *Mayo/Alice* step two." *Id.* There, the "claims address[ed] the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." *Id.* Representative claim 19, for instance, recited (1) storing "visually perceptible elements" associated with various host websites; (2) automatically identifying a particular host when visited by a website user; and (3) constructing and displaying to the website user a web page that merged the "visually perceptible elements" of the host with content associated with a third-party merchant's products. *Id.*

Stated differently, the claimed solution in *DDR Holdings* enabled a first website, Website A, to present the products of a second website, Website B, without losing potential customers to Website B. *Id.* at 1257-58. Using the claimed solution, Website A could automatically merge its branding and style with the information and products of Website B. *Id.* Consequently, web users could remain under the perception that they were shopping on Website A, despite the fact that they were ultimately viewing and purchasing Website B's products through Website A. *Id.*

This was a problem and a solution with no "pre-Internet analog." *Id.* at 1258. The dissent in *DDR Holdings* argued that it was simply a computer-implemented version of a "'store within a store' concept, such as a warehouse store that contains a kiosk for selling a third-party

<div align="center">13</div>

partner's cruise vacation packages." *Id.*  The majority explained, however, that this comparison

failed "to account for the ephemeral nature of an Internet 'location' or the near-instantaneous

transport between these locations made possible by standard Internet communication protocols,

which introduces a problem that does not arise in the 'brick and mortar' context." *Id.*  The

majority further explained:

> [O]nce a customer enters a physical warehouse store, that customer
> may encounter a kiosk selling third-party cruise vacation packages.
> There is, however, no possibility that by walking up to this kiosk,
> the customer will be suddenly and completely transported outside
> the warehouse store and relocated to a separate physical venue
> associated with the third-party—the analog of what ordinarily
> occurs in "cyberspace" after the simple click of a hyperlink—
> where that customer could purchase a cruise package without any
> indication that they were previously browsing the aisles of the
> warehouse store, and without any need to "return" to the aisles of
> the store after completing the purchase.

*Id.*  Thus, "the <u>claimed solution</u> amount[ed] to an inventive concept for resolving this particular

Internet-centric problem, rendering the claims patent-eligible." *Id.* at 1259 (emphasis added).

### ii.    Claims of the Patents-in-Suit Are Not *DDR*-type Software Claims.

MacroPoint's one paragraph discussion of *DDR Holdings* makes no attempt to

demonstrate that the claims of the patents-in-suit are like the claims upheld in that case.[9]  Nor

can it, because the claims of the patents-in-suit do not claim a specific solution for resolving a

particular Internet-centric problem, but rather they "broadly and generically claim 'use of the

Internet' to perform an abstract business practice (with insignificant added activity)." *See DDR*

*Holdings*, 773 F.3d at 1258 (contrasting the valid claims of *DDR Holdings* with the invalid

---

[9] MacroPoint's only actual citation to *DDR Holdings* is at page 22 of its brief.  Although
*DDR Holdings* is also referenced on page 23, it is in the context of a citation to the district court
decision in *Messaging Gateway Solutions*.  And while *DDR Holdings* is cited again at page 29,
the quoted language does not, in fact, appear in *DDR Holdings*, and the pin citation to pages 15
and 16 cannot be correct as *DDR Holdings* is found at pages 1245 through 1263.

claims of *Ultramercial*).

### iii.    MacroPoint's "Expert" Cannot Rewrite the Claims.

The emphasis on the "claimed solution" and the elements of the "claims" themselves is critically important, because it is the claims, not the specifications, that govern analysis under § 101. *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013).   MacroPoint and Mr. Zatkovich go far beyond the patents-in-suit, however, to concoct a story about "conventional closed systems" and MacroPoint's alleged invention of an "open system."  Not only is this creation entirely missing from the specifications of the patents-in-suit, it is also nowhere to be found in the <u>claims</u> themselves.

For example, MacroPoint describes these supposed conventional systems as being proprietary systems specific to a particular freight company in which the location of freight is limited to the freight company's user group.  Claim 1 of the '943 patent, which is representative of all the claims of all of the patents-in-suit, claims: (a) creating a relationship between freight and a communications device, such as a cell phone; (b) receiving a request the location of freight; (c) transmitting a notice to the cell phone that its location will be obtained; (d) receiving the consent of the cell phone for obtaining location information; (e) sending a request for location information to a location information provider, which may be the cell phone's wireless provider; (f) receiving the location information for the cell phone; (g) updating the location information of the freight based on the relationship with the cell phone; and (h) sending the location of the freight to the requester.  '943 patent at 20:63-21:38.

All the alleged features that MacroPoint and Mr. Zatkovich attribute to the patents-in-suit are missing from the claims themselves.  None of the "open system" or "network architecture" that MacroPoint and Mr. Zatkovich describe now—to try to avoid an order invalidating these

patents—is present in the claims.  No communications protocol of any kind is claimed, let alone a particular one that enables dissimilar systems to interact with one another.  The claims do not require "real-time monitoring," "heterogeneous location technology," or any of the other buzz words presented now by MacroPoint and Mr. Zatkovich in an attempt to impart patent eligibility.

Despite its desperate attempts to do so, MacroPoint may not now rewrite the claims of the patents-in-suit, either via its brief or through a declaration, to avoid an adverse subject-matter eligibility finding. *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("As this court has repeatedly cautioned, extrinsic evidence cannot be used to vary the plain language of the patent document."); *see also Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*, No. 14-cv-4957, 2015 WL 3637740, at *10 (N.D. Ill. June 12, 2015) (rejecting patentee's attempt to rewrite patent by way of expert declaration and entering judgment of invalidity on the pleadings).

Like the alleged expert in *Market Track*, MacroPoint and Mr. Zatkovich seek to limit the patents-in-suit to particular embodiments that read on open systems, but not closed systems, or that provide real-time tracking or have particular architectures.  None of those details are in the specifications of the patents-in-suit, let alone the claims themselves.  As the district court in *Market Track* found, even if the specifications of the patents-in-suit set forth detailed implementations—they do not—those embodiments cannot make a patent eligible under § 101 if the "claims themselves only contain generalized software components arranged to implement an abstract concept on a computer." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012).

For the same reasons, MacroPoint's attempt to distinguish *Wireless Media Innovations* is unavailing.  MacroPoint argues that "[u]nlike the patents of *Wireless Media Innovations*, the

claims of the patents-in-suit provide for an open system for multi-channel, real-time tracking of vehicles and freight nationwide."  MacroPoint Br. at 13.  Alas, the claims of the patents-in-suit do not recite limitations that require any of: (a) an open system; (b) multi-channel operation; (c) real-time tracking; or (d) nationwide tracking.[10]

MacroPoint could not (and did not) distinguish *Wireless Media Innovations* based on what is actually claimed in the patents-in-suit.  There, as here, the patents were directed to methods and "computerized systems" for monitoring and recording the location of freight.  2015 WL 1810378 at *2.  There, as here, the claimed systems "collect[ed] relevant data as to the location of the [freight], and the process of inputting data in a computer for the purpose of generating a report."  *Id.* at *11.  Like the "correlation" of "location information" in the patents-in-suit, these were "routine steps of recording, identifying, and communicating" that did "not transform an otherwise abstract idea into patent-eligible subject matter."  *Id.*  Indeed, the patents in *Wireless Media Innovations* even included real-time tracking (which is not a claimed limitation in the claims of the patents-in-suit), and the district court still found the patents merely recited "conventional steps" and "insignificant data-gathering" that "add[ed] nothing of practical significance to the underlying abstract idea."  *Id.*

Likewise, MacroPoint's preemption arguments are unavailing.  While MacroPoint contends that certain prior art systems fall outside the scope of the patents-in-suit as rewritten by

---

[10] MacroPoint also claims without substantiation or explanation that, unlike the claims in *Wireless Media Innovations*, the claims of the patents-in-suit cannot be performed by a human using pencil and paper.  To the contrary, as FourKites commented in its opening brief, merchants or shippers have long tracked freight with paper logs or other written records.  FourKites Br. at 16.  MacroPoint does nothing to rebut this undeniable observation.  The claims of the patents-in-suit simply recite "signals" and "logic" in lieu of mental steps.  *See Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x 1005, 1007-08 (Fed. Cir. 2014) (holding invalid system and method claims that recited "selecting, storing, and retrieving" data because "not only can these steps be carried out in existing computers long in use, but they also can be done mentally.").

17

Mr. Zatkovich, the actual claims of the patents-in-suit are written such that they encompass those systems.  Indeed, FourKites will contend in its soon-to-be-served invalidity contentions that the claims of the patents-in-suit are invalid as anticipated or obvious.  But even if the patents-in-suit did not preempt <u>every</u> prior art version of tracking freight, that does not make the claims of the patents-in-suit eligible under § 101.  For example, the existence of prior systems for hedging risk did not preclude a finding of invalidity under § 101 in *Bilski*.  561 U.S. at 611-12; *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) ("And that the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract.").  Here, too, the analysis turns on whether the <u>claims</u>—as opposed to the prior art—include "meaningful limitation[s]" other than "well-understood, routine, conventional data-gathering activities."  *Id.* at 1363-64; *see also Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) ("Where a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, as they are in this case, preemption concerns are fully addressed and made moot.").

> ### iv.  MacroPoint's Contentions and Public Statements Belie Its Current Characterization of the Patents-in-Suit.

Tellingly, when MacroPoint is not trying to avoid outright dismissal of its patent claims, it has a much different interpretation of what its patents claim.  In its Initial Infringement Contentions, MacroPoint identifies as Accused Instrumentalities, any software solution "that in whole or in part: determines, tracks, or monitors location of a vehicle, freight, or communication device; receives information about the location of a vehicle, freight, or communication device; or transmits information about the location of a vehicle, freight, or communication device."  *See* Ex. J at 2.  Similarly, in a September 8, 2015 industry trade magazine, MacroPoint described its patents as "cover[ing] systems and methods for tracking and monitoring freight or vehicles

carrying that freight.  The freight or vehicle carrying the freight is correlated with a communications device such as mobile phones, both flip phones and smart phones, ELD/GPS devices, and other similar types of devices."  *See* Ex. K.

Based on these descriptions, even MacroPoint admits (when to its apparent advantage) that the claims of the patents-in-suit are far from particular solutions to specific problems rooted in computer technology as seen in *DDR Holdings*.[11]  Rather, like the claims in *Ultramercial*, *buySafe*, or *Content Extraction*, even MacroPoint sometimes describes the claims as nothing more than the recitation of a known practice from pre-Internet days along with the requirement that it be done using a "communications device," which can be anything from a cell phone, to a GPS, to any other generic mobile computer.

> **b.    Applying the *Mayo/Alice* Framework, the Claims of the Patents-in-Suit Are Directed to Patent Ineligible Subject Matter.**

> **i.    Step One – The Patents-in-Suit Claim an Abstract Idea.**

MacroPoint objects to FourKites "condensing the claims to some abstract concept," but that is precisely what the Supreme Court and the Federal Circuit instruct.  In *Alice*, the Supreme Court distilled the claims to "the concept of intermediated settlement."  134 S. Ct. at 2355-56.  In *Bilski*, it reduced the claims to "the basic concept of hedging."  *Bilski v. Kappos*, 561 U.S. 593, 610-611 (2010).  In *Content Extraction*, the Federal Circuit stated the claims were directed to the "basic concept of data recognition and storage," 775 F.3d at 1347, and in *Ultramercial* it found

---

[11]  For the same reasons, the claims of the patents-in-suit are also not like those in *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, No. 14-732, 2015 WL 1744343 (D. Del. Apr. 15, 2015).  The patent in that case was "directed to the abstract idea of translation," *id.* at *4, but the district court found the claims patentable because they recited a solution to a computer technology problem—*i.e.*, a specific method of converting text messages into internet messages that can be sent to a computer rather than a mobile phone.  *Id.* at *5.  The claims of the patents-in-suit do not recite any analogous, specific method for translating information between dissimilar systems.

"the abstract idea at the heart of the [] patent was 'that one can use an advertisement as an exchange or currency.'"  772 F.3d at 714.

MacroPoint argues that the claims are directed to "transmitting signals to very specific parties, with very specific information, and yielding very specific results," and accuses FourKites of improperly analyzing *Mayo/Alice* step one.  *See* MacroPoint Br. at 19-20.  In fact, "[a]pplication of the first *Mayo* step does not include a detailed examination of the asserted claims, either individually or as an 'ordered combination'; that analysis is properly lodged within step two."  *Kenexa BrassRing, Inc. v. Hireability.com, LLC*, No. 12-10943, 2015 WL 1943826 at *4 (D. Mass. Apr. 28, 2015); *see also Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) ("Under step one of *Mayo/Alice*, the <u>claims are considered in their entirety</u> to ascertain whether <u>their character as a whole</u> is directed to excluded subject matter." (emphasis added)).

The purpose of this first step is to "ascertain[] the basic character of the subject matter." *Internet Patents*, 790 F.3d at 1348.  MacroPoint contends that the claims of the patents-in-suit include "detailed limitations" that "very much tether[] [them] to real-world applications," but that is not the question at *Mayo/Alice* step one.  *See Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations . . . add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea").

FourKites' identification of an abstract idea is supported by MacroPoint's own representations of what its patents cover: "systems and methods for tracking and monitoring freight or vehicles carrying that freight."  Ex. K.  That is, the abstract idea of "tracking freight."

### ii.    Step Two – The Patents-in-Suit Lack an Inventive Concept.

All of the claims of all of the patents-in-suit also fail under step two because they include

nothing more than generic computer components to perform routine computer operations. *Ultramercial*, 772 F.3d at 716 (holding routine steps like data-gathering, updating records, and restricting access based on performance of conditions are insufficient to make a claim patent eligible); *see also Mayo*, 132 S.Ct. at 1301 ("[S]imply implementing a mathematical principle on a physical machine, namely a computer, was not a patentable application of that principles."). Mere "data-gathering steps . . . add nothing of practical significant to the underlying abstract idea." *Ultramercial*, 772 F.3d at 716.

As FourKites explained in its opening brief, the claims of the patents-in-suit primarily consist of "receiving" and "transmitting" signals. FourKites Br. at 18.  That these signals are now claimed to be "to very specific parties, with very specific information, and yielding very specific results" is irrelevant because sending and receiving information—even "specific information"—is insufficient to confer patentability.  *See Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*, 558 Fed. App'x 988, 993 (Fed. Cir. 2014) ("Nor does the particular configuration of steps—obtaining, separating, and then sending information—confer patentability."); *see also Alice*, 134 S. Ct. at 2359 (holding invalid claims that "use [] a computer to obtain data, adjust account balances, and issue automated instructions").

Likewise, FourKites explained that the recitation of "correlating" steps or "correlation logic" was insufficient to render the claims of the patents-in-suit eligible.  FourKites Br. at 18-19.  FourKites supported its proposition with multiple cases wherein district courts found patents that recited such limitations invalid and entered judgment on the pleadings.  *Id.*  MacroPoint made no attempt to distinguish these cases.  Instead, MacroPoint identified three supposed inventive concepts.  Each of these, however, is not an inventive concept under *Mayo* and *Alice*.

**(1)     Correlation is Not an Inventive Concept**.

"Correlating the location information of a communications device with the location of freight or a vehicle," is not an inventive concept.  Correlation is not a technological feature of computer science—it is simply the creation and maintenance of a relationship between one thing and another thing.  The patents-in-suit illustrate, for example, "how a correlation logic may correlate a vehicle to a communications device or the location of the vehicle to the location information of the communications device."  '943 patent at 3:33-26 (describing Figure 2).

Figure 2 of the patents-in-suit, reproduced at right, depicts a table in a relational database containing various data fields.  *See* '943 patent at 5:50-64.  Each row 105*a-g* represents a vehicle, and for each vehicle column 210*a* lists "drivers," and column 110*a* lists "communications devices."  *Id.*  The drivers are identified by name, and the devices are identified by telephone numbers.  *Id.*

| | Active Driver 210a | Active Device 110a | Backup Driver 210b | Backup Device 110b | Total Capacity ft³ / lbs. | Available Capacity ft³ / lbs. |
|---|---|---|---|---|---|---|
| 105a | Bianchi Campagnolo | (143) 846-5405 | Bob Haro | (443) 240-5465 | 4,013 42,660 | 4,013 42,660 |
| 105b | Gary Fisher | (546) 542-1235 | | | 3,931 42,010 | 2,531 22,010 |
| 105c | Merlin Cannondale | (242) 643-5461 | Malvern Star | (563) 543-5865 | 2,878 Ref. 36,280 | 0 Ref. 0 |
| 105d | Colnago Cinelli | (563) 543-5635 | Ross Raleigh | (243) 546-5435 | 2,878 Ref 36,280 | 2,878 Ref. 36,280 |
| 105e | Pinarello De Rosa | (843) 446-2475 | Giant Trek | (587) 847-5635 | 3,931 42,010 | 3,268 41,700 |
| 105f | Emilio Bozzi | (507) 543-5475 | Murray Schwinn | (548) 243-5433 | 3,268 41,700 | 0 0 |
| 105g | Freddie Grubb | (843) 243-3685 | Marin Huffy | (509) 343-5265 | 4,013 42,660 | 0 0 |

**Figure 2**

"In the illustrated embodiment, the vehicle 105*a* is associated with an active driver 210*a* named Bianchi Campagnolo who is associated with an active device 110*a* identified by an identifier corresponding to the telephone number (143) 846-5405."  *Id.* at 6:14-18.  Thus, a correlation exists between vehicle 105*a*, the driver Bianchi Campagnolo, and the communications device that has the phone number (143) 846-5405.  *Id.* at 6:18-41.

If one knows where that communications device is, one can surmise where Mr. Campagnolo and truck 105*a* is as well—that is all that is meant by "correlating the location information of a communications device with the location of freight or a vehicle." *Id.* at 6:33-39 ("In this way, the correlation logic 170 can transform the location information of the communications device 110 into information regarding the location of the vehicle 105 by correlating the location information of the communications device 110 to the location of the vehicle 105 based at least in part on the communications device 110 being associated with the user who is associated with the vehicle 105.").

As discussed in FourKites' opening brief (and unrebutted by MacroPoint), it is well established that correlating data is, itself, an abstract idea, and that implementing correlation with basic computer components, such as a relational database, is insufficient to make the idea patentable. *See* FourKites Br. at 18-19; *see also Shortridge v. Found. Constr. Payroll Serv., LLC*, No. 14–cv–04850–JCS, 2015 WL 1739256, at *12 (N.D.Cal. Apr. 14, 2015) ("[R]elational databases are well-understood, routine, conventional" and using them "to store and organize labor data . . . does no more than require a generic computer to perform generic computer functions.").

MacroPoint argues that the existence (or lack thereof) of a GPS receiver is significant with respect to "correlation," but its contention is internally inconsistent and at direct odds with the claims of the patents-in-suit.  MacroPoint says "[c]laim 1 provides a technical solution to the technical problem of how to monitor the location of the freight or vehicle by technical means other than a dedicated GPS receiver installed in the vehicle."  MacroPoint Br. at 25.  Claim 1 of the '943 patent is not so limited, however, because claim 2 specifies a narrower embodiment

wherein location information is obtained using a method "other than GPS."[12]  In fact, in other claims the patents-in-suit explicitly claim <u>using</u> GPS.  *See, e.g,* '295 patent at claim 3.  Still others claim both using GPS <u>or</u> using something other than GPS.  *See, e.g,* '097 patent at claim 4.  MacroPoint's supposed inventive concept tied to GPS is a fallacy.

Finally, MacroPoint's contention that the Patent Office "found that the claims included an inventive concept" is a mischaracterization of the record.  In the context of § 101, the phrase "inventive concept" is essentially a term of art as guided by *Alice*, *Mayo*, and their progeny.  As discussed, above, the Patent Office never explicitly addressed § 101, and thus never stated whether correlation is an "inventive concept" such that the claims of the patents-in-suit are eligible subject matter.  The notice of allowance cited by MacroPoint is only a determination by the Examiner that the claimed "correlation" of the patents-in-suit was different than the correlation discussed in the prior art references Janky and Woolley.  *See* Ex. L.  Even if that determination were correct (and FourKites does not agree that it was), it does not mean that "correlating" is an inventive concept under 35 U.S.C. § 101.

### (2)  Obtaining Information is Not an Inventive Concept.

"Obtaining location information of communications device from a 'location information provider' that is a party or device other than the communications device" is not an inventive concept.  MacroPoint argues that the claims of the patents-in-suit allow tracking of a variety of communication devices—flip phones, smartphones, and GPS units—which, it contends, is a "technical solution" to an "additional technical challenge."  MacroPoint Br. at 26-27.

Once again, MacroPoint seeks to rewrite the claims to include limitations that are not

---

[12] Under the doctrine of claim differentiation, when a dependent claim adds a limitation (*i.e.*, the exclusion of GPS in claim 2), the independent claim necessarily does not have that limitation (*i.e.*, GPS is not excluded in claim 1).

present.  The claims of the patents-in-suit do not require any particular kind of communications device.  They only recite that "location information" is obtained from "a location information provider" that is "a party or device other than the communications device."  MacroPoint contends "this technical solution allows for obtaining location information from multiple channels," but that is not a technical solution at all—it is an end, not a means.  The specifications of the patents-in-suit, as well as their claims, fail to describe how a system "obtain[s] locating information from multiple channels," they simply say that they do.

And while the claims recite possible sources of location information, or methods for how that location information might originally be calculated (advance forward link trilateration, observed time difference, etc.), MacroPoint does not allege it invented those sources or those methods of calculating location information.  Indeed, the patents-in-suit explicitly acknowledge that these were existing "[a]lternative methods for monitoring location of vehicles."  '943 patent at 1:48-50.  "Monitor[ing] the location of freight or vehicles by technical means without relying directly on receiving GPS-based information to determine location of freight or a vehicle" cannot possibly supply an "inventive concept" for the claims of the patents-in-suit when it was already being done in the prior art.

Ultimately, all that the claims recite is obtaining location information from a source.  That is, obtaining data, which is a basic and generic computer function.  *See Internet Patent*, 790 F.3d at 1349 (holding limitations reciting "generic data collection steps or siting the ineligible concept in a particular technological environment" do not provide an inventive concept).  Therefore, this limitation is not an inventive concept for any of the claims of the patents-in-suit.

### (3) **Providing Notice/Obtaining Consent is Not an Inventive Concept**.

MacroPoint contends that providing notice and obtaining consent was a "technical

challenge requiring a novel solution." MacroPoint Br. at 28. MacroPoint alleges the "novel solution" was sending a signal to the communications that made a message appear stating location information would be obtained, and receiving a signal "indicative of consent." Once again, the claims do not recite a solution, but a desired end. And, once again, the alleged solution is nothing more than sending information back and forth. Thus, this is also not an inventive concept.

Additionally, this notice / consent idea cannot provide the inventive concept because it was already known. The patents-in-suit incorporate by reference the pre-existing International Association for the Wireless Industry's Best Practices and Guidelines for Location-Based Services (the "CTIA Guidelines"). The CTIA Guidelines provided <u>industry standards</u> for the use of tracking systems that include the features of notice and consent <u>more than two years</u> before the effective filing date of the patents-in-suit.

Finally, MacroPoint one again mischaracterizes the actions of the Patent Office by alleging that the Examiner found the notice and consent limitations were an "inventive concept." *See* MacroPoint Br. at 29. The notices of allowance cited by MacroPoint stands for nothing more than that the Examiner determined the prior art references under consideration did not include the recited "notification logic" in combination with the several other limitations also listed in the notice of allowance. *See* Exs. L, M. The statement has no bearing on whether this limitation constitutes an inventive concept for any of the claims of the patents-in-suit.

## III. FourKites' Reliance On Representative Claims is Proper.

MacroPoint objects to FourKites' reliance on representative claims, but that is precisely how courts routinely examine such matters, and MacroPoint fails to identify how any of the claims of any of the patents-in-suit materially differ. In its opening brief, FourKites detailed the

claims of the '943 patent, and explained why the claims of the '943 patent were representative of all the claims of all the patents-in-suit.  *See* FourKites Br. at 3-7.  FourKites even submitted an exhibit summarizing every limitation of every claim of the patents-in-suit.  *See* FourKites Br. at Ex. E.  MacroPoint takes issue with this well-accepted practice without providing any counter-argument as to why a claim-by-claim analysis of every claim of every patent-in-suit is necessary.

It is well established that courts can rely on representative claims when they are substantially similar and linked to the same abstract idea.  *See Content Extraction*, 776 F.3d at 1348 ("The district court . . . correctly determined that addressing each claim of the asserted patents was unnecessary" because some claims are representative); *see also Wolf v. Capstone Photography, Inc.*, No. 2:13–CV–09573, 2014 WL 7639820, at *10 & n. 3 (C.D. Cal. Oct. 28, 2014) ("The Supreme Court's precedents have not required a court deciding § 101 eligibility to parse each individual claim, instead finding an analysis of representative claims sufficient.").  Indeed, in *Alice* the Supreme Court found <u>208 claims</u> patent-ineligible based on its analysis of just <u>one</u> representative claim. *See Alice*, 134 S. Ct. at 2359-60.  Therefore, FourKites' reliance on representative claims was proper.

## IV.    The Patents-in-Suit Are Invalid Even Under MacroPoint's Preferred Standards.

Contrary to MacroPoint's representations, it is far from settled whether the presumption of validity and the clear and convincing evidence standards apply to *Alice* motions, and in fact the majority of courts suggest that it should not.[13]  While FourKites contends those standards are not applicable to the claims of the patents-in-suit, the Court need not resolve these conflicts

---

[13] "[W]hile it appears that the majority of district courts that have considered the issue have reasoned that the clear and convincing standard should not apply to a § 101 analysis, there is a split of authority and continued uncertainty."  Ex. N, Law360, Section 101: Should Clear And Convincing Standard Apply? (Sept. 28, 2015)  (citing *Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-1067, 2015 WL 184528, at *5-6 (D. Del. Apr. 22, 2015)).

because the patents-in-suit are clearly invalid even applying those standards.

"Issues of patent-eligible subject matter are questions of law." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011).  Neither the Federal Circuit nor the Supreme Court have spoken to whether the clear and convincing evidentiary standard applies to determinations of patent eligibility, and district courts are split on the question.  *Compare Blue Spike, LLC v. Google Inc.*, No. 14-CV-01650-YGR, 2015 WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015) ("[O]n a motion for judgment on the pleadings for invalidity, where no extrinsic evidence is considered, the "clear and convincing" standard for weighing evidence in determining a patent's validity is inapplicable.") *with Everglades Game Techs., LLC v. Supercell, Inc.*, No. 14-643, at *3-6 (D. Del. Aug. 21, 2015) (finding patent invalid under 35 U.S.C. § 101 by clear and convincing evidence and granting motion to dismiss).[14]

The presumption of validity is the converse of the clear and convincing evidence standard.  *See State Contracting & Engr. Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003) ("A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence.").  Although Judge Mayer's concurrence in *Ultramercial* questions whether that presumption applies to § 101, the Court need not resolve this dispute because even applying that presumption, the claims here are invalid.

Contrary to MacroPoint's assertion, the patents-in-suit do not enjoy a greater presumption

---

[14] As explained in *In re TLI Commc'ns LLC Patent Litigation*, No. 14MD2534, 2015 WL 627858 at *19 (E.D. Va. Feb. 6, 2015), "[t]his dispute stems in large measure from Justice Breyer's concurrence in *Microsoft v. i4i Ltd.*, 131 S. Ct. 2238 (2011)," wherein he "noted that the clear and convincing evidence standard 'applies to questions of fact and not to questions of law' and '[w]here the ultimate question of patent validity turns on the correct answer to legal questions—what these subsidiary legal standards mean or how they apply to the facts as given— today's strict standard of proof has no application.'"

of validity.  As discussed above, there is no debate that the Examiner did not expressly address a rejection under § 101.  But even if the Examiner had, this does not make FourKites' burden any greater.  Indeed, as the Federal Circuit has explained in the context of the Patent Office considering § 102 or § 103 in view of particular prior art, "[w]hether a reference was previously considered by the PTO, the burden of proof is the same." *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012).  "As the Supreme Court explained in *i4i*, there is no heightened burden of proof when a reference was previously considered by the PTO, and no lowered burden of proof if a defendant raises a new reference or argument during litigation."  *Id.*

Where, as here, the patents-in-suit themselves demonstrate that the claims are directed to an abstract idea and do not include an inventive concept, the Court can conclude that the presumption of validity is overcome and that the patents-in-suit are invalid by clear and convincing evidence.  *See Carfax, Inc. v. Red Mt. Technologies*, 1:14-CV-01590-GBL, 2015 WL 4740513, at *5 (E.D. Va. Mar. 30, 2015) ("At the pleading stage, the Court derives 'clear and convincing evidence' of a patent's invalidity from the patent claims.").  The Court may dismiss MacroPoint's claims and enter judgment that the patents are invalid without deciding whether the clear and convincing standard applies.  *See, e.g., TLI Commc'ns*, 2015 WL 627858, at *19 (granting motion to dismiss because patent invalid under § 101 despite declining to resolve dispute about evidentiary standard); *MicroStrategy Inc. v. Apttus Corp.*, No. 3:15-cv-21, 2015 WL 4425828, at *1 n.5 (E.D. Va. July 17, 2015) (same).

## V.  This Case Should Be Resolved in Favor of FourKites Without Further Delay.

Section 101 eligibility is a threshold matter.  *Bilski*, 561 U.S. 593.  As Judge Mayer stated in his concurring opinion in *OIP Techs.*, "[a]ddressing 35 U.S.C. § 101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with

discovery" but "it also works to stem the tide of vexatious suits."  778 F.3d at 1364.  MacroPoint has given no reason why this issue should not be resolved now, at the outset of this case, before either the Court or the parties invest further resources.  MacroPoint is using the existence of this lawsuit to publicly criticize FourKites and others in press releases, direct letters to competitors, and industry presentations.  As FourKites' non-infringement contentions demonstrate, none of its services infringe any of the patents-in-suit.   And as FourKites' invalidity contentions will demonstrate, MacroPoint did not invent what it now claims its patents encompass.  But, most importantly, the patents-in-suit are invalid on their face under § 101, and neither the Court nor the parties should be forced to expend additional resources litigating those issues.  Accordingly, the Court should find the patents-in-suit invalid under § 101 and grant FourtKites' motion to dismiss.

<div align="center">

**CONCLUSION**

</div>

WHEREFORE, Defendant FourKites, Inc. requests that the Court enter an order finding all the claims of United States Patent Nos. 8,604,943; 9,070,295; 9,082,097; 9,082,098; and 9,087,313 invalid as directed to patent ineligible subject matter under 35 U.S.C. § 101 and dismissing MacroPoint, LLC's Complaint with prejudice; and for all other relief the Court finds just and appropriate.

Dated: September 29, 2015

<div style="margin-left: 40%;">

Respectfully submitted,
/s/Harold E. Farling
Harold E. Farling (0055891)
Thomas G. Kovach (0047213)
KOVACH & FARLING CO., LPA
925 Leader Building
526 Superior Avenue East
Cleveland, Ohio 44114-1401
(216) 357-3301
(216) 357-3304 (fax)

</div>

<div align="center">

30

</div>

hfarling@kflpa.com
tkovach@kflpa.com

Gary E. Hood (Admitted Pro Hac Vice)
GHood@Polsinelli.com
Adam S. Weiss (Admitted Pro Hac Vice)
AWeiss@Polsinelli.com
Mark T. Deming (Admitted Pro Hac Vice)
MDeming@Polsinelli.com
POLSINELLI PC
161 North Clark Street, Suite 4200
Chicago, Illinois 60601
(312) 819-1900

*Attorneys for Defendant*
*FourKites, Inc.*

## CERTIFICATION

The present case has not yet been assigned to a track.  On July 31, 2015, the Court granted permission for this Memorandum to be up to thirty pages in length.  In compliance with Local Civil Rule 7.1(f), the undersigned hereby certifies that the length of this Memorandum complies with the Court's Order.

/s/Harold E. Farling

## CERTIFICATE OF SERVICE

A copy of the foregoing is being filed this 29th day of September, 2015 and is being served upon counsel of record by operation of the Court's electronic filing system.

/s/Harold E. Farling